1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JOHN ELLIOTT, RICARDO CAMARGO,
JAVIER ROVIRA, and BRADLY SMITH,

                              Plaintiffs,

          v.

VALVE CORPORATION,

                              Defendant.

Case No. 2:24-cv-01218

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

CLASS ACTION COMPLAINT - 1
Case No. 2:24-cv-01218

011258-11/2686081 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

**TABLE OF CONTENTS**

**Page**

I.     OVERVIEW OF THE ACTION ...................................................................1

II.    PARTIES ..................................................................................................6

       A.    Plaintiffs ........................................................................................6

       B.    Defendant ......................................................................................7

III.   JURISDICTION AND VENUE .................................................................7

IV.    JUSTICIABILITY ....................................................................................8

V.     BACKGROUND .......................................................................................9

       A.    Valve transforms itself from a PC game publisher to a platform
             monopolist.....................................................................................9

       B.    Having entrenched itself as the gateway to PC games, Valve
             extracts supra-competitive prices from sales on Steam. ...................10

VI.    RELEVANT MARKETS ...........................................................................11

       A.    Both relevant product markets are limited to PC games...................12

       B.    First Relevant Product Market – PC Game Distribution ...................14

       C.    Second Relevant Product Market – PC In-Game Payment
             Processing ....................................................................................16

       D.    Geographic Market ........................................................................18

VII.   VALVE POSSESSES MONOPOLY POWER IN THE RELEVANT
       MARKETS ...............................................................................................18

       A.    Valve dominates the PC Game Distribution Market and the PC In-
             Game Payment Processing Market. .................................................18

       B.    Barriers to entry are high. ..............................................................20

       C.    Valve's supracompetitive prices and ability to restrict output
             provide direct proof of its monopoly power. ...................................21

VIII.  STEAM HAS UNLAWFULLY MONOPOLIZED THE RELEVANT
       MARKETS ...............................................................................................22

       A.    Valve's PMFN restricts price competition. .....................................22

**HAGENS BERMAN**

B.    Valve restricts competition by tying PC In-Game Payment Processing to PC Game Distribution. ............................................... 27

C.    Valve's PMFN and tying conduct have severe anticompetitive effects. ....................................................................................................... 28

1.    Valve's PMFN suppresses competition and causes consumers to pay higher prices. ......................................... 28

2.    Valve's tying conduct impedes competition and causes consumers to pay higher prices. ......................................... 32

IX.    VALVE'S ANTICOMPETITIVE RESTRAINTS HAVE PREVENTED RIVAL PLATFORMS FROM SEIZING SIGNIFICANT MARKET SHARE. ................................................................................................... 32

A.    Discord ..................................................................................... 33

B.    Microsoft, Amazon, Google ................................................... 34

C.    Epic Games Store ................................................................... 35

X.    VALVE'S ANTICOMPETITIVE PRACTICES DIRECTLY HARM CONSUMERS ........................................................................................ 37

A.    Valve uses Steam Keys to protect its monopoly and overcharge consumers. ............................................................................... 40

B.    Valve advises publishers not to engage in price competition and facilitates price coordination. .................................................. 42

XI.    CLASS ACTION ALLEGATIONS ............................................... 44

XII.    INTERSTATE TRADE AND COMMERCE ................................. 46

XIII.    FRAUDULENT CONCEALMENT ............................................. 46

XIV.    CAUSES OF ACTION .................................................................. 47

FIRST CAUSE OF ACTION  SHERMAN ACT SECTION 2—MONOPOLIZATION OF THE PC GAME DISTRIBUTION MARKET (15 U.S.C. § 2) ................................................................................... 47

SECOND CAUSE OF ACTION  SHERMAN ACT SECTION 2—ATTEMPTED MONOPOLIZATION OF THE PC GAME DISTRIBUTION MARKET (15 U.S.C. § 2) ................................................................................... 48

THIRD CAUSE OF ACTION ............................................................... 49

CLASS ACTION COMPLAINT - ii
Case No. 2:24-cv-01218

011258-11/2686081 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

SHERMAN ACT SECTION 2—MONOPOLIZATION OF THE PC IN-GAME
    PAYMENT PROCESSING MARKET (15 U.S.C. § 2) .................................................49

FOURTH CAUSE OF ACTION  SHERMAN ACT SECTION 2—ATTEMPTED
    MONOPOLIZATION OF THE PC IN-GAME PAYMENT
    PROCESSING MARKET (15 U.S.C. § 2)......................................................................50

FIFTH CAUSE OF ACTION  SHERMAN ACT SECTION 1—
    UNREASONABLE RESTRAINTS ON TRADE THROUGH
    PUBLISHERS (15 U.S.C. § 1) .......................................................................................51

SIXTH CAUSE OF ACTION  SHERMAN ACT SECTION 1—
    UNREASONABLE RESTRAINTS ON TRADE BY TYING CONDUCT
    (15 U.S.C. § 1) ..............................................................................................................52

SEVENTH CAUSE OF ACTION  WASHINGTON STATE CONSUMER
    PROTECTION ACT, RCW 19.86......................................................................................54

EIGHTH CAUSE OF ACTION  CALIFORNIA UNFAIR COMPETITION LAW
    ("UCL"), CAL. BUS. & PROF. CODE SECTION 17200 ET SEQ. ............................54

PRAYER FOR RELIEF .......................................................................................................55

JURY DEMAND ..................................................................................................................56



Plaintiffs John Elliott, Ricardo Camargo, Javier Rovira, and Bradly Smith ("Plaintiffs") bring this action against Valve Corporation under federal and state antitrust laws and state unfair competition laws, seeking public injunctive relief and damages, and allege as follows:

## I.     OVERVIEW OF THE ACTION

1.      Defendant Valve Corporation sells Personal Computer ("PC") games through its online store, the Steam Store.  Valve launched Steam in the early 2000s to distribute its own games, but soon recognized an opportunity to generate additional revenue by distributing games developed and marketed by third-party game publishers.  Soon after its launch in 2005, the Steam Store achieved market dominance, which it has maintained and enhanced ever since. Today, PC games generate billions annually, and Valve takes a staggering 75% of the bounty.

2.      Valve generates its revenues primarily through a 30% tax it imposes on game publishers[1] and, in the end, game consumers.  If a publisher sells a game on Steam for $30, Valve takes a whopping $9 of the proceeds, which is almost pure profit to Valve given the low marginal costs of operating an online game store.  Similarly, Valve takes the same 30% cut for payment processing whenever a publisher sells in-game products (e.g., game enhancements sold during gameplay), even though most payment processors would charge fees of 4% or less for these payment processing services.  In the words of one former Valve employee, these high fees have made Valve a "virtual printing press," one that imposes a "30% tax on an entire industry."[2]

3.      While Valve imposes its 30% tax on game publishers, the overcharge is ultimately born by consumers in the form of inflated prices for games and in-game products. This is because Valve's fees, like any other cost of doing business, are built into the prices publishers charge consumers for games and in-game products.  Plaintiffs in this case are consumers who paid those supracompetitive prices and were directly injured as a result.

---

[1] In the PC gaming environment, a game "publisher" is generally understood to be the entity that markets a game.  The publisher may also be the creator or "developer" of the game, but need not be.

[2] APramath, *Former Valve Employee Says Steam Was Killing PC Gaming, Epic Games Is Saving It*, GAMINGBOLT (Apr. 8, 2019), https://gamingbolt.com/steam-was-killing-pc-gaming-epic-games-store-is-saving-it-former-valve-employee.



4.      Valve is able to charge exorbitant fees and maintain market dominance not because it built a superior PC games store.  Far from it, Valve maintains market dominance by strangling competition with nakedly anticompetitive pricing restraints.  These pricing restraints are embodied in what economists call a platform most-favored-nations clause (the "PMFN").  Valve's PMFN prevents any publisher that sells a game on Steam from either (a) selling that game on a rival platform for a lower price (price parity), or (b) providing additional game content or enhancements on a rival platform (content parity).  As explained by the founder and CEO of Epic Games ("Epic"), a putative competitor of Valve, "Steam has veto power over prices, so if a multi-store developer wishes to sell their game for a lower price on the Epic Games store than Steam, then . . . Valve can simply say 'no.'"[3]

5.      To understand how Valve's PMFN impedes competition, it is important to first envision how competition would unfold in a well-functioning market for PC games and in-game products.  In a functioning market, game publishers could (and would) vary the pricing of their games and in-game products to reflect variance in the platform fees charged by game stores and payment processors serving the market.  This is normal retail pricing behavior across industries.  For example, if a game store charged 12% instead of Valve's 30% (and as discussed below, some do), without Valve's PMFN game publishers would be incentivized to *lower* their prices on that rival platform, both to reflect the platform's lower costs and also to drive consumers to this more cost-effective (and thus profit-maximizing) distribution channel.  So, instead of charging a flat $30 wherever a game is sold, absent the PMFN, a publisher could charge $30 on Steam, and $25 on a rival platform charging a lower 12% commission, which represents almost 17% in savings to consumers.

---

[3] Tim Sweeney (@TimSweeneyEpic), TWITTER (Jan. 30, 2019, 9:29 AM), https://twitter.com/timsweeneyepic/status/1090663312814157824?lang=en.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

|  | STEAM | RIVAL PLATFORM |
|---|---|---|
| **Platform Fee** | 30% | 12% |
| **Price to Consumer** | $30.00 | $25.00 |
| **Developer Net Revenue (Price to Consumer – Platform Fee)** | $21.00 | $22.00 |

6.      This type of normal differential pricing, which is seen in any competitive market,
would incentivize rival platforms to compete more aggressively with Valve on platform fees.
That is, to win business, platforms would maintain lower platform fees to incentivize publishers
to discount prices on their platforms to attract consumers.  Facing this threat of lost volume,
Valve would be incentivized to lower its fees to compete, driving prices down across the market.

7.      And again, consumers would be the ultimate beneficiaries of this normal price
competition.  Absent Valve's PMFN, consumers would benefit, first, from the lower prices
publishers could charge for their games and in-game products on rival platforms.  Consumers
would also benefit from the lower market-wide platform fees that would prevail in a competitive
market because, like other costs, all platform fees (including Valve's) are absorbed into the
prices game publishers charge consumers.  Those fees, and thus prices, would be lower in a
market functioning without Valve's PMFN.

8.      Valve's PMFN prevents this competition to maintain Valve's stranglehold on the
market.  By strictly barring discounts (or enhanced content) on rival platforms, Valve's PMFN
requires Steam publishers to charge the same price (for the same content) wherever those games
and in-game products are sold, even though underlying platform fees can vary significantly.
This thwarts rival platforms' ability to seize market share from Valve by offering lower platform
fees.  To the extent rival platforms do offer lower fees, Valve's PMFN prevents publishers from
reducing prices on their games to steer consumers to these platforms.  Instead, to recoup costs,
publishers must bake Valve's anticompetitive fees into a supracompetitive, uniform price and
impose it wherever those games and in-game products are sold.



9.      The anticompetitive effects of Valve's PMFN can also be seen in the lived experience of the PC gaming market.  Time and time again, well-resourced platforms have tried to compete with Valve in the sale of PC games and in-game products—including Electronic Arts ("EA"), Microsoft, Amazon, and Epic—but the PMFN has prevented them all from gaining meaningful traction.  Unable to offer consumers discounts (or better content) when they purchase from these rival platforms, game publishers have no meaningful ability to steer customers away from Valve to discipline Valve's pricing.  The failure of these well-resourced rivals, and persistence of Valve' supracompetitive fees for over two decades, illustrates the durable monopoly power Valve exercises over the market.

10.      Valve's anticompetitive restraints have generated blockbuster profits by any metric.  Reports indicate that the Steam Store generated around $7.4 billion from game sales in 2021, meaning Valve earns approximately $2.2 billion annually from its 30% tax on Steam sales.[4]  Remarkably, in 2021 Valve had just 79 dedicated Steam employees.[5]  This means that the 30% tax Steam imposes (on game sales alone) is generating at least $28 million annually per Steam employee![6]  That astonishing figure laps (many times over) the already high revenues-per-employee generated by the largest and most profitable technology companies in the world.

---

[4] VG Insights, *Global PC Games Market Report 2024* (Jan. 3, 2024), https://vginsights.com/insights/article/global-pc-games-market-report-2024.

[5] Kyle Orland, *Valve runs its massive PC gaming ecosystem with only about 350* employees, ARS TECHNICA, (July 17, 2024), available at:  https://arstechnica.com/gaming/2024/07/valve-runs-its-massive-pc-gaming-ecosystem-with-only-about-350-employees/.

[6] These calculations are conservative because Steam's revenues have increased since 2021, reaching $9 billion in 2023.  And while 2021 is the last year for which Steam employee head counts are publicly available, the total number of Steam employees has been consistently trending downwards.  Finally, the above calculations only include Steam revenues on game sales, excluding the substantial additional revenue Steam generates from in-game transactions.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1
2
3
4
5
6
7
8
9
10
11
12



13    11.    And most of Steam's revenues are pure profit given the modest costs of

14 maintaining an online game store and in-game payments platform.  Upstart PC game stores have

15 determined that they can cover costs by charging 10% commissions *or less*.[7]  Valve is charging

16 three times that, despite operating at scale and with the efficiencies accrued over nearly two

17 decades of business.

18    12.    Valve's staggering profits have been generated at the expense of consumers who

19 are overcharged when they purchase games and in-game content at inflated prices from Steam.

20 The Plaintiffs in this proposed class action were not only injured by Valve's anticompetitive

21 conduct, they are best-positioned to challenge it having overcome arbitration provisions in

22 Valve's consumer-facing agreements.

23    13.    Specifically, in *Wolfire Games, LLC v. Valve Corp.*, No. 21-cv-00563 (W.D.

24 Wash.), the court held that a delegation provision in Valve's consumer terms of use required that

25 threshold issues of arbitrability—including the enforceability of Valve's consumer-facing

26

27    [7] Nelly, *Why not 90/10?*, DISCORD (Dec. 14, 2018),
28 https://web.archive.org/web/20190326130854/https://blog.discordapp.com/why-not-90-10-3761ebef4eab?gi=ce1e3200843c.

CLASS ACTION COMPLAINT - 5
Case No. 2:24-cv-01218
011258-11/2686081 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

arbitration provision—be determined in arbitration.  *See* ECF No. 66 at 3.  Class plaintiffs often pull up stakes when arbitration is so compelled.  But the Plaintiffs in this action, who were not named plaintiffs to the *Wolfire* complaint, did not.  They retained separate counsel and mounted a sustained and ultimately successful challenge to the enforceability of Valve's arbitration provision.  Specifically, the named Plaintiffs won binding decisions from arbitrators rendering Valve's arbitration provision unenforceable for both lack of notice and because it impermissibly seeks to bar public injunctive relief.

14.     By successfully challenging Valve's arbitration provision, Plaintiffs have demonstrated their ability to vigorously prosecute this action on behalf of the proposed class.  Moreover, unlike the only other consumers to have challenged Valve's PMFN, the Plaintiffs in this case will not be undermined by any conflict of interest.  In the *Wolfire* action, the same lawyers have purported to represent both consumers and game publishers challenging Valve's PMFN.  But while these groups may each wish to challenge Valve's conduct, their interests diverge irreconcilably, particularly when it comes to assessing the anticompetitive effects of the PMFN and measuring damages.

15.     Plaintiffs seek to hold Valve fully accountable for its anticompetitive conduct.  Asserting monopolization and tying claims under the Sherman Act, as well as unfair competition claims under applicable state law, Plaintiffs seek all available remedies needed to redress their injuries, along with public injunctive relief that reintroduces competition into the PC gaming market to benefit the public at large.

## II.     PARTIES

### A.     Plaintiffs

16.     Plaintiff John Elliott is a resident of California. Mr. Elliott has purchased PC games through the Steam Store. As a result of Defendant's anticompetitive practices, Mr. Elliott has paid supracompetitive prices for PC games.

17.     Plaintiff Ricardo Camargo is a resident of California. Mr. Camargo has purchased PC games through the Steam Store. As a result of Defendant's anticompetitive practices, Mr. Camargo has paid supracompetitive prices for PC games.



18.     Plaintiff Javier Rovira is a resident of Florida. Mr. Rovira has made PC games and in-game purchases through the Steam Store. As a result of Defendant's anticompetitive practices, Mr. Rovira has paid supracompetitive prices for his purchases.

19.     Plaintiff Bradly Smith is a resident of Missouri. Mr. Smith has purchased PC games through the Steam Store. As a result of Defendant's anticompetitive practices, Mr. Smith has paid supracompetitive prices for PC games.

**B.      Defendant**

20.     Defendant Valve Corporation is a Washington Corporation with a principal place of business at 10400 NE 4th Street, Suite 1400, Bellevue, Washington, 98004-5174. Valve, an American video game developer, publisher, and digital distribution company, operates a PC gaming platform (the "Steam Gaming Platform") and is a distributor of PC games through the Steam Store.  Valve also separately provides payment processing services for purchases made within PC games distributed through the Steam Store.

### III.      JURISDICTION AND VENUE

21.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Valve for the injuries to Plaintiffs and the Class, alleged herein, arising from Valve's violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs also assert claims under Washington's Consumer Protection Act, RCW 19.86, seeking treble damages and injunctive relief under RCW 19.86.090, as well as claims under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq., seeking restitution, injunctive relief, and other available remedies.

22.     The Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, as well as pursuant to 28 U.S.C. §§ 1331 and 1337(a). The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

23.     This Court has personal jurisdiction over Valve because Valve's headquarters are located in this judicial district, specifically in Bellevue, Washington. Valve has engaged in



1   sufficient minimum contacts with the United States and has purposefully availed itself of the

2   benefits and protections of both the United States and Washington such that the exercise of

3   jurisdiction over Valve would comport with due process.

4       24.     Valve also is subject to personal jurisdiction because, either directly or through its

5   agents or affiliates, Valve transacted business throughout the United States, including in this

6   District, that was directly related to the claims at issue in this action.

7       25.     Additionally, the Court has jurisdiction over Valve because Valve's principal

8   place of business is in Washington State.

9       26.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 because

10  Valve is found in and transacts business in this District.

11      27.     Venue also is proper pursuant to 28 U.S.C. § 1391(b), (c), and (d) because, during

12  the relevant period, Valve resided, transacted business, was found, or had agents in this District;

13  a substantial part of the events or omissions giving rise to these claims occurred in this District;

14  and a substantial portion of the affected interstate trade and commerce discussed herein was

15  carried out in this District.

16                      **IV.     JUSTICIABILITY**

17      28.     In 2021, a group of game consumers and a game publisher filed a class action

18  complaint in the United States District Court for the Western District of Washington, alleging

19  that Valve engages in anticompetitive practices to monopolize PC gaming markets. *See* Class

20  Action Compl., *Wolfire Games, LLC v. Valve Corp.*, No. 21-cv-00563 (W.D. Wash. Apr. 27,

21  2021), ECF No. 1.

22      29.     Valve moved to compel arbitration of the consumers' claims, relying on an

23  arbitration clause in the fine print of its consumer-facing terms of use.  Specifically, consumers

24  wishing to purchase games through the Steam Store must check a box to indicate their agreement

25  to the terms and conditions of Valve's Steam Subscriber Agreement ("SSA") before completing

26  a purchase.

27      30.     Consumers in the *Wolfire* action contested the enforceability of the arbitration

28  provision but the Court ruled that the threshold issue of arbitrability was delegated to, and



1    needed to be resolved in, arbitration.  The Court accordingly granted Valve's motion to compel

2    arbitration.  *See id.* ECF No. 66.

3        31.    Plaintiffs to this class action complaint were not named plaintiffs in the *Wolfire*

4    action.  They retained separate counsel and asserted individual claims in arbitration challenging

5    the enforceability of Valve's arbitration provision.  Each prevailed, obtaining rulings that the

6    arbitration provision was unenforceable, either for lack of notice, or because it purports to

7    preclude public injunctive relief in violation of the McGill rule (*McGill v. Citibank*, *N.A.*, 393

8    P.3d 85, 90-92 (Cal. 2017)), or both.  The arbitrator thus granted each Plaintiff's motion to

9    dismiss the arbitration.

10                   **V.      BACKGROUND**

11   **A.    Valve transforms itself from a PC game publisher to a platform monopolist.**

12       32.    Valve Corporation was founded in 1996 by two former Microsoft employees. The

13   company quickly made a name for itself in the PC gaming industry with its first product, "Half-

14   Life," released in 1998. Following this success, Valve continued to release influential titles,

15   including "Counter-Strike," "Team Fortress," "Portal," "Left 4 Dead," and "Dota 2."

16       33.    In addition to being a game developer, Valve operates by far the largest PC

17   gaming platform in the world, Steam, where users can purchase PC games directly from third-

18   party game publishers. Valve first released Steam in 2003. What started off as a digital platform

19   to provide automatic updates to Valve's games quickly evolved into a comprehensive PC gaming

20   distribution platform for thousands of creators and publishers to deliver content while enabling

21   millions of game players to purchase, download, and manage games.[8]

22       34.    As a PC gaming marketplace, Steam provides an extensive library of games from

23   third-party publishers for Steam users. As of 2024, Steam hosts over 73,000 games, with over

24   14,000 games being published in 2023 alone.[9] The platform allows users to manage their game

25

26       [8] Valve Corp., *About Us*, https://www.valvesoftware.com/en/about (last visited Aug. 7, 2024).

27       [9] J. Clement, *Steam gaming platform – Statistics & Facts*, STATISTA (Jan 10, 2024), https://web.archive.org/web/20240713180659/https://www.statista.com/topics/4282/steam/#topic

28   Overview; Chris Kerr, *All signs suggest it was a record-breaking year for new releases on*

libraries, download and install games, and automatically update their games. Steam also supports cloud saves, enabling users to save their progress online and access their game data from any device.

35.      In addition to PC games, Steam allows users to purchase in-game items, also known as "microtransactions," on its platform. Steam users can purchase virtual goods and services such as character skins, trading cards, and premium content within a game. Steam provides payment processing services for these in-game transactions (or microtransactions). Specifically, Steam offers a Steam Wallet, where players can add funds to make in-game transactions, as well as a payment processing platform through which game publishers can receive and clear funds spent on in-game products.

36.      Steam has become a "must have" PC game distribution channel for both large studios and indie developers, providing them with access to Steam's massive user base. As of 2019, Steam had over 1 billion registered accounts with 90 million active users and upwards of 14 million daily concurrent users.[10] In early 2024, Steam set new records with 33.7 million concurrent users and over 10.8 million users actively playing games simultaneously, underscoring its dominance in the PC gaming market.[11]

**B.      Having entrenched itself as the gateway to PC games, Valve extracts supra-competitive prices from sales on Steam.**

37.      For access to this expansive PC gaming marketplace, Valve demands significant fees on third-party game publishers. Indeed, Steam generates most of its revenue through a mandatory 30% tax on game sales and in-game transactions. Sales on the Steam Store have

---

*Steam*, GAME DEVELOPER (Jan. 2, 2024), https://www.gamedeveloper.com/business/latest-estimates-show-over-14-000-new-titles-launched-on-steam-in-2023

[10] Ryan Yuen, *The Rise of Steam: A Case Study o the Most Dominant Force in Gaming*, LINKEDIN (Nov. 21, 2021), https://www.linkedin.com/pulse/rise-steam-case-study-most-dominant-force-gaming-ryan-yuen

[11] Rich Stanton, *Steam kicks off 2024 with its highest-ever concurrents and player count*, PC GAMER (Jan. 8, 2024), https://www.pcgamer.com/steam-kicks-off-2024-with-its-highest-ever-concurrents-and-player-count/



increased steadily, reaching $9.0 billion in 2023 for game sales alone, with Steam taking approximately 30% of the sale proceeds through its commission.[12]

Steam Market Size, Full Game Sale Revenue (2019-23, $bn)



38.    As a popular platform and early mover into online PC game distribution, Steam exercised significant market power when it set its 30% tax on game sales and in-game transactions.  While 30% was at the time a common commission rate for brick-and-mortar distribution of games, such distribution channels have substantially higher operational costs, including rent, utilities, staff salaries, and logistics for stocking and distributing games.

39.    As a primarily online distributor of digital content, Steam has far lower operational costs, and yet Steam was able to impose (and has retained ever since) a 30% commission on game distribution and in-game purchases.  Steam's ability to set its commission substantially above marginal costs is a testament to its substantial market power, both when the 30% fee was set and ever since.

## VI.    RELEVANT MARKETS

40.    A relevant antitrust market contains both a product dimension (the "product market") and a geographic dimension (the "geographic market"). Valve competes in two distinct

---

[12] VG Insights, *Global PC Games Market Report 2024* (Jan. 3, 2024), https://vginsights.com/insights/article/global-pc-games-market-report-2024.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX


1    product markets: (1) the PC Game Distribution market, and (2) the PC In-Game Payment

2    Processing market.  The relevant geographic market is at least as large as the United States.

3    **A.      Both relevant product markets are limited to PC games.**

4           41.     Other types of games, such as console games and mobile games, are not a

5    reasonable substitute for PC games.

6           42.     A PC game is specifically designed to be played on personal computers, utilizing

7    the hardware and software capabilities of PCs, which can be customized and upgraded with

8    various components such as graphics cards, processors, memory, and storage to enhance

9    performance and graphics quality. In contrast, games for consoles utilize specialized plug-and-

10   play hardware such as the PlayStation, Xbox, and Nintendo Switch. "Console gaming enthusiasts

11   especially buy their new console versions just to play the latest games released. Therefore, we

12   can say that gaming consoles have created a unique community of players."[13]

13          43.     While PC game players enjoy unparalleled performance and immersive

14   experiences provided by powerful GPUs, CPUs, and RAM, mobile games, designed for

15   smartphones and tablets, excel in portability and accessibility. Mobile games are specifically

16   designed to be highly portable and accessible, making them convenient for on-the-go play.

17          44.     Gamers are unlikely to switch to a different gaming platform due to the

18   significant investment they have made in one gaming ecosystem. For instance, a gamer who has

19   built extensive game libraries and social networks on Steam is less inclined to buy the Xbox

20   version of a game, even if they own an Xbox, due to the social and economic investments

21   already made on Steam.

22          45.     Reflecting the distinct consumer base for PC games, and the unique experience

23   PC gamers expect, a PC version of a game is generally compatible only with PCs and does not

24   function across other platforms. For example, an Xbox version of a particular game is not

25   interchangeable with a PC version of that same game due to the fundamental differences such as

26

27          [13] Starloop, *Mobile Games Vs. PC Vs. Console Games: What Market is the Best Bet?*,
     https://starloopstudios.com/mobile-games-vs-pc-vs-console-games-what-market-is-the-best-bet/

28   (last visited Aug. 7, 2024).



operating systems and hardware architecture. These differences ensure that each version is optimized for its specific platform, providing the best possible performance and user experience.

46.     Gaming industry participants recognize PC games as distinct products from other types of games. GameStop, as a general video game distributor, lists PC gaming as a separate game type on its website.



47.     The PC Game Distribution market satisfies the test for market definition used by federal antitrust enforcement agencies, widely known as the "SSNIP test." The test asks whether a hypothetical monopolist in a proffered market could profitably impose a small but significant (typically 5%), non-transitory increase in price (a "SSNIP"), without causing a sufficient number of customers to switch to other products or services such that the SSNIP would be unprofitable to the monopolist. If the SSNIP is profitable, the market is properly defined. If the SSNIP is not profitable, the market is too narrowly defined, and does not encompass sufficient economic substitutes.

48.     Here, the PC Game Distribution market will pass a SSNIP test. For the reasons discussed above, a 5% increase in PC games' price would not cause a sufficient number of PC gamers to switch to console games (such that the increase would be rendered unprofitable). This is because the price increase would not outweigh the reasons many gamers prefer playing on PCs



1    and the significant investment they have made in building their game libraries and social

2    networks on the platform.

3        49.    Valve also emphasized the distinctions between the different types of gaming

4    markets in a response to a third-party subpoena in an antitrust case between Epic and Apple in

5    the Northern District of California.[14] There, Valve acknowledged that "Apple, Google and

6    Samsung compete with each other in the mobile app market. Valve does not compete in that

7    market." Valve further asserted that there was "no evidence" suggesting that a "relevant market

8    could be so broad as to include any video game available through any channel" and that there

9    was little evidence that "iOS users owned multiple devices and changed from one to another in

10   response to price changes."[15]

11       50.    Valve's concession that the mobile market and PC games market are different

12   markets holds true for the console market as well. Valve does not sell, market, or compete in the

13   market for console games.

14   **B.    First Relevant Product Market – PC Game Distribution**

15       51.    Valve competes in the PC Game Distribution market. In this market, Valve (and

16   other lesser) platforms provide intermediation services allowing consumers to purchase, and

17   game publishers to sell, PC games. Participants in the PC Game Distribution market compete to

18   attract gamers to their storefronts, while simultaneously competing to attract PC Game

19   publishers willing to market their games through the platform.

20       52.    Publisher demand for game distribution is tied to consumer demand for

21   distribution. That is, a platform offering distribution of PC games is appealing to publishers only

22   insofar as it is capable of reaching an audience of consumers willing to purchase PC games. And

23   vice versa. A platform offering PC games is more appealing to consumers if it has attracted a

24   large population of publishers and, accordingly, can offer a wide selection of quality games.

25

26

27       [14] *See, e.g.*, Jt. Letter Br. Re: Apple's Subpoena to Non-Party Valve Corp., *Epic Games, Inc. v. Apple, Inc.*, Case No. 4:20-cv-05640-YGR (N.D. Cal. Feb. 18, 2021), ECF No. 346.

28       [15] *Id.* at 6-7.



53.     Valve is a competitor in the PC Game Distribution market through the Steam Store. The Steam Store sells PC games that are enabled for the Steam Gaming Platform.

54.     Today most PC game distribution occurs digitally via the internet.  But this is a relatively new phenomenon. Widespread digital distribution of PC games did not begin in earnest until the 2000s. Prior to the 2000s, brick-and-mortar distributors were the dominant sellers of PC games.

55.     There were several smaller PC digital game distributors in the early 2000s, when the Steam Store launched. But, faced with Valve's quickly-obtained dominance and ability to compel gamers and publishers to the Steam Gaming Platform, those rival distributors were unable to gain a material foothold in the market and quickly folded. For example, early online distributor Stardock could not keep pace with Steam and was eventually purchased by GameStop in 2011.

56.     The trend toward digital distribution for PC games accelerated dramatically as a result of the global pandemic. Data published in January 2021 indicates that many consumers were increasingly spending their time at home playing PC games.[16] For example, at the beginning of the pandemic in March 2020, Steam saw its concurrent user count surge to what was then an all-time high of over 20 million gamers,[17] and the demand for distribution of PC games has only grown since then.

57.     According to Valve:

> While Steam was already seeing significant growth in 2020 before COVID-19 lockdowns, video game playtime surged when people started staying home, dramatically increasing the number of customers buying and playing games . . . . This has led to new highs for monthly active users (120.4 million), daily active users (62.6 million), peak concurrent users (24.8 million), first-time purchasers

---

[16] J. Clement, *Increase in video game sales during the coronavirus (COVID-19) pandemic worldwide as of March 2020*, STATISTA (Jan. 29, 2021), https://www.statista.com/statistics/1109977/video-game-sales-covid/.

[17] Noah Smith, *The giants of the video game industry have thrived in the pandemic. Can the success continue?*, WASH. POST (May 12, 2020), https://www.washingtonpost.com/video-games/2020/05/12/video-game-industry-coronavirus/.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

(2.6 million per month), hours of playtime (31.3 billion hours), and the number of games purchased (21.4% increase over 2019).[18]

58.     Overall, digital PC game sales increased from 20% of PC game sales in 2009 to 83% of PC game sales in 2018.[19]

59.     For the reasons discussed above, PC games are not reasonably interchangeable with other categories of games. Distribution of PC games is therefore not reasonably interchangeable with distribution of other categories of games. There is not a significant positive cross elasticity of demand between the distribution of PC games and the distribution of other types of video games such as console or mobile games.

60.     A hypothetical monopolist in the PC Game Distribution market could profitably impose a small but significant and non-transitory increase in price ("SSNIP") that, because of the factors addressed above, would not cause an unprofitable number of gamers or publishers to switch their desired format of games (for example, to console or mobile) and therefore switch away from the PC Game Distribution market.

C.     **Second Relevant Product Market – PC In-Game Payment Processing**

61.     Once a PC Game has been sold in the distribution market, it offers a vehicle for further "in-game" transactions.  For example, publishers often monetize their games by selling gamers various in-game enhancements.  The range of in-game products available within PC games is endless, and includes in-game implements (a shield or magic spell), level unlocks, extra lives, and in-game currency, to take but a few examples.

62.     A payment processing service is needed for consumers to purchase in-game products, and for publishers to sell them.  Payment processing services verify payment details, store user information, track payment history and process funds.  Payment systems of this sort are commonplace across industries and digital marketplaces.  They are a separate product from

---

[18] *Steam - 2020 Year in Review*, STEAMWORKS (Jan. 13, 2021), https://store.steampowered.com/news/group/4145017/view/2961646623386540826.

[19] J. Clement, *Distribution of computer and video game sales in the United States from 2009 to 2018, by delivery format*, STATISTA (May 17, 2022), https://www.statista.com/statistics/190225/digital-and-physical-gamesales-in-the-us-since-2009.

the antecedent market in which consumers purchase PC games, i.e., the PC Game Distribution market. Payment processing services for in-game purchase can be offered separately and, in fact, are widely demanded separately by both consumers and publishers.

63.     Valve offers in-game payment processing for games distributed through Steam. This is a distinct service offered by Valve.

64.     Valve provides this functionality with a software solution—"microtransaction APIs"—that publishers can use to process in-game payments. Enabling this service involves a multi-step implementation process, separate and apart from the process publishers must follow to make their games available for distribution on the Steam Store.

65.     While Steam publishers could use a variety of payment processing services to manage in-game purchases—or develop their own payment mechanisms—Valve strictly forbids them from using anything but Steam's Microtransaction APIs. And likewise, consumers who purchase a game from Steam and wish to later obtain in-game products are barred from using any payment mechanism other than their Steam Wallet. Valve's guidelines provide in this regard: "For in-game purchases, you'll need to use the microtransaction API so Steam customers can only make purchases from the Steam Wallet."[20]

66.     Having barred consumers and publishers from using any alternative payment processor, Valve is able to impose the same supracompetitive 30% tax within the PC In-Game Payment Processing market that it does when distributing games in the PC Game Distribution market.

67.     While Valve imposes the same fee in both markets, they are distinct, segregable products for which there is separate demand. The market proves this. For example, Epic, which operates the Epic Games Store, offers an in-game payments processing service. But unlike Valve, Epic allows game publishers who sell their games on the Epic Games Store to choose whatever payment processor they wish to use for in-game purchases. And payments providers have stepped in (e.g., Xsolla) to provide this freestanding product. This demonstrates that PC In-

---

[20] Steamworks Documentation, *Microtransactions (In-Game Purchases)*, https://partner.steamgames.com/doc/features/microtransactions (last visited Aug. 7, 2024).

1    Game Payment Processing is a separate, freestanding product that is not subsumed within the

2    antecedent market for PC Game Distribution.  There is separate demand for PC In-Game

3    Payment Processing.

4         68.    A competitive market for PC In-Game Payment Processing would offer

5    consumers widespread choice between competing payment processors for in-game payment

6    processing services, including on games distributed through the Steam Store.  Those servicers

7    could compete on fees, and there is much room for competition given that the going rate for

8    payment processing hovers around 4%, just a small fraction of the 30% Valve charges for the

9    same service.  Rival payment processors would also compete on quality, offering more

10   innovative, secure, and reliable payment processing services to attract consumers and enhance

11   their gameplay.  Valve's prohibition on rival payment processing services insulates Valve from

12   this competitive threat and allows it to maintain supracompetitive fees that get absorbed into the

13   prices consumers pay whenever they purchase in-game products.

14   **D.    Geographic Market**

15        69.    Participants in the PC Game Distribution market and PC In-Game Payment

16   Processing market operate worldwide and distribute PC games and in-game payment processing

17   service across national boundaries, including digitally over the internet.  Accordingly, the

18   relevant geographic dimension for both product markets is at least as broad as the United States.

19   **VII.   VALVE POSSESSES MONOPOLY POWER IN THE RELEVANT MARKETS**

20   **A.    Valve dominates the PC Game Distribution Market and the PC In-Game Payment
        Processing Market.**

21
22        70.    Valve is the dominant distributor of PC games, with at least a 75% market share

23   of the PC Game Distribution market.  Within the market for PC In-Game Payment Processing,

24   Valve processes 100% of in-game purchases for games acquired through the Steam Store, such

25   that Valve's market share for the entire PC In-Game Payment Processing market is likely to

26   approximate its 75% share of PC Game Distribution.

27

28

**HAGENS BERMAN**

71.     Due to its large market share and user base, game publishers generally consider Steam a must-have. As put by one game publisher, "As a developer, it's scary to have one entrenched company dominating all of PC games since we are completely at Valve's mercy."[21]

72.     The vast majority of all PC games are played today on Steam. As explained by an EA executive, PC game publishers "want to be where the players are," which in the case of PC games means Steam.[22] During the COVID-19 pandemic, for example, there were more than 22 million users on the Steam Gaming Platform in a single day, and over 6.2 million gamers playing games at the same time.[23] The popularity of the Steam Gaming Platform reinforces the market power of the Steam Store, further entrenching its dominant position in the marketplace.

73.     Very few PC games have found success outside of Steam, and such games typically require a long history of recognition and success before they can attempt to thrive without distribution through the Steam Store.  Such games are rare—the Steam Store has over 70,000 games available whereas the number of PC game franchises that can avoid Steam entirely can be counted on two hands.

74.     Moreover, other outlets for PC games— including Amazon, GameStop, Walmart, Target, and online storefronts, like Green Man Gaming and Humble Bundle—all sell Steam Keys. A Steam Key is a digital "key" that allows the customer to download and maintain the game through the Steam Gaming Platform, and only through the Steam Gaming Platform. Valve controls if and how many Steam Keys a developer can sell, and Valve can deactivate these keys if it chooses. Thus, Steam Key retailers are actually selling Valve's product and extending Valve's control of the PC Game Distribution market.

---

[21] Nick Statt, *Epic vs. Steam: the console war reimagined on the PC*, THE VERGE (Apr. 16, 2019), https://www.theverge.com/2019/4/16/18334865/epic-games-store-versus-steam-valve-pcgaming-console-war-reimagined.

[22] Chaim Gartenberg, *EA games are returning to Steam along with the EA Access subscription service*, THE VERGE (Oct. 29, 2019), https://www.theverge.com/2019/10/29/20937055/ea-gamessteam-access-subscription-service-pc-storefront-jedi-fallen-order-sales.

[23] James Batchelor, *Record number of Steam users online during coronavirus outbreak*, GAMESINDUSTRY.BIZ (Mar. 14, 2019), https://www.gamesindustry.biz/discord-game-store-refocuses-on-nitro-subscription-as-servers-allow-devs-to-sell-games-directly.

75.     As addressed above, Valve further dominates the PC In-Game Payment Processing Market by strictly foreclosing rival payment processors from offering their services for in-game purchases within games distributed through the Steam Store.  Hoarding these valuable in-game transactions for itself, Steam imposes its 30% tax whenever Steam gamers make an in-game purchase.

76.     Given its unassailable dominance, Valve has the ability to increase prices and reduce output in both relevant markets, *i.e.*, monopoly power.

**B.     Barriers to entry are high.**

77.     The PC Game Distribution market and PC In-Game Payment Processing market have substantial barriers to entry. These barriers are typical of technology platforms, and include network effects,[24] switching costs,[25] and the accumulation of data,[26] among other factors.  All of these barriers to entry apply to both relevant markets.

78.     Network effects are the feedback loop of demand that can be generated by a platform that mediates successfully between two groups of users.  With respect to gaming platforms like Steam, the more consumers that frequent the platform, the more attractive it is to publishers.  Likewise, consumers value a gaming platform that has attracted a large body of publishers, because this ensures a wide selection of high-quality games.  Network effects make it difficult to compete against Steam, an incumbent with a large base of users and publishers.  To seize meaningful market share—for either PC Game Distribution or PC In-Game Payment Processing—a would-be competitor must harness the same network effects by appealing to large numbers of users on both sides of the platform.  This is a difficult hurdle for startup platforms, and even well-resourced technology companies, to clear.

[24] Majority Staff of H. Subcomm. on Antitrust, Com. & Admin. Law of the Comm. on the Judiciary, 116th Cong., *Investigation of Competition in Digital Markets* at 40 (Oct. 6, 2020), available at https://democrats-judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf ("Digital Markets Report").

[25] *Id.* at 41.

[26] *Id.* at 42-44.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

79.     Switching costs also create barriers to entry.  While users can theoretically operate on multiple PC gaming platforms, once they have accumulated a game library, game achievements, and a social network on one platform, switching platforms means starting from square one.  This discourages switching platforms and, accordingly, makes it difficult for new entrants to compete with Valve.

80.     Valve also enjoys a structural advantage over entrants due to the substantial amount of data it gathers on game usage, game preferences, social networks, and other facets of gameplay.  With enormous amounts of data at its fingertips, Valve is able to better market its products and identify commercial opportunities than are would-be competitors.  It is well recognized that such data collection advantages incumbents and "can serve as another powerful barrier to entry for firms in the digital economy."[27]

81.     Barriers to entry in the PC In-Game Payment Processing market are also erected by Valve's complete prohibition on rivals offering payment processing services for games distributed through the Steam Store.  Absent that prohibition, rival payment processing services could readily serve the market and compete with Valve.  But exercising substantial market power in the upstream distribution market, Valve is able to severely restrict access to the PC In-Game Payment Processing market.  A would-be entrant in this market can only offer its services on PC gaming platforms other than Steam.  Because Steam dominants the market, this makes it exceedingly difficult for payment processing services to profitably enter.

**C.    Valve's supracompetitive prices and ability to restrict output provide direct proof of its monopoly power.**

82.     In a competitive market, prices tend toward marginal costs, or the cost of producing one additional unit of the product sold.  It is readily apparent that Valve's 30% take rate on game distribution and in-game payment processing is grossly above Valve's marginal costs and, thus, supracompetitive.

83.     Other gaming platforms have reported that, despite lacking the Steam Store's scale and accrued efficiencies, they could remain profitable charging just 10-12%, or even less,

---

[27] *Id.* at 42.

in platform fees.  Epic Games has acknowledged in court filings that "Epic decided to charge developers a 12% revenue share after it concluded that 12% would be competitive, sufficient to cover its costs of distribution and allow for further innovation and investment in EGS."  Epic's CEO, Tim Sweeney, has further confirmed that "[f]ixed costs of developing and supporting the platform become negligible at a large scale.  In our analysis, stores charging 30 per cent are marking up their costs by 300 to 400 per cent."[28]

84.     Gaming platform Discord likewise launched with a 10% platform fee, observing that this "covers [the store's] operating costs," and that the platform would "explore lowering it [further] by optimizing our tech and making things more efficient."[29]

85.     In a competitive market, Valve's platform fees would be driven down to a competitive level closer to its marginal costs.  Valve has never faced this competition.  Insulating itself with PMFN and tying restraints, Valve has been able to sustain a 30% take rate from the inception of its platform.  Valve's ability to sustain these high fees over a roughly 20-year period, despite historic advancements in digital distribution tools and motivated would-be competitors, is a testament to the enormous market power Valve exercises in both relevant markets.

**VIII.   STEAM HAS UNLAWFULLY MONOPOLIZED THE RELEVANT MARKETS**

86.     Valve does not dominate the PC Game Distribution and PC In-Game Payment Processing Markets through competition on the merits.  Rather, Valve has built and maintained monopoly power through anticompetitive restraints.

**A.     Valve's PMFN restricts price competition.**

87.     To insulate itself from competition, Valve has imposed a PMFN on game publishers who list their games in the Steam Store.  Like PMFNs generally, Valve's PMFN compels publishers to sell their games and in-game product at the Steam Store price (or higher)

[28] Seth Barton, *New Epic Games Store Takes on Steam with just 12% revenue share – Tim Sweeney answers our questions*, MCV/DEVELOP (Dec. 4, 2018), available at: https://mcvuk.com/development-news/new-epic-games-store-takes-on-steam-with-just-12-revenue-share-tim-sweeney-answers-our-questions/.

[29] Discord, *supra* note 7.



in all distribution channels, including distribution channels that are not connected to Steam, and distribution channels that offer more favorable pricing (i.e., fees substantially below Valve's 30% tax).

88.     Valve's PMFN has been formulated differently over time, and has been expressed in both written and unwritten rules and guidance.  It has never been lifted and remains in effect today.  In all iterations, Valve's PMFN serves to thwart price competition that might undermine Steam's market dominance.  As Epic Games' CEO put it:  "Steam has veto power over prices, so if a multi-store developer wishes to sell their game for a lower price on the Epic Games store than Steam, then: 1.) Valve can simply say 'no.'"[30]

89.     Valve maintains active oversight over pricing.  Steam's guidelines provide that publishers' "[i]nitial pricing as well as proposed pricing adjustments will be reviewed by Valve and are usually processed within one or two business days."[31]  This oversight allows Valve to maintain attentive review of pricing, and pricing changes on Steam to enforce PMFN compliance.

90.     With the PMFN, Valve controls—including through punishment and threats— publishers who attempt to use pricing incentives (i.e., discounts) to steer customers to alternative distribution channels for PC games and in-game products. If publishers do not abide by Valve's mandates, they risk losing access to the Steam platform altogether, which can be devastating given that most PC gamers use Steam.

91.     Valve's PMFN is particularly insidious because it distorts competition over not only Steam-enabled versions of PC games, but *all* PC games.  That is, the PMFN applies not just to games that can be played on Steam, but also to alternative versions of the same game that have been developed for alternative gaming platforms.

92.     The PMFN severely restricts competition from rival distribution channels.  To effectively compete against Valve, rival platforms need to draw significant numbers of gamers

---

[30] Sweeney, *supra* note 2.

[31] Steamworks Documentation, *Store Presence, Pricing*, https://partner.steamgames.com/doc/store/pricing (last visited Aug. 7, 2024).

CLASS ACTION COMPLAINT - 23
Case No. 2:24-cv-01218
011258-11/2686081 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

and publishers onto their platform, harnessing the network effects of platform economics.  The most direct means of doing this is to reduce publishers' fees (i.e., the platform's commission).  This accomplishes two things, at least in a competitive market.  It encourages publisher participation on the platform because publishers want to pay lower platform fees.  It also (absent the PMFN) gives the publishers the ability to reduce prices to steer customers onto the platform (and away from Steam).

93.    But with its PMFN, Valve controls publishers' retail prices and effectively sets a price floor across the entire market. With Valve's PMFN in place, even if a rival platform charges commissions lower than Valve's 30%, publishers cannot draw gamers onto the rival platform by offering lower prices on that platform.  They have to charge the same uniform price across the market.  They also have to provide users with the same content across platforms.  This leaves gamers with little incentive to switch away from Steam.

94.    Valve has a long history of enforcing its PMFN.  For example, it invoked the PMFN to block competition from the Discord Store. As detailed further below, Discord attempted to compete with Steam by launching a game distribution store that charged a 10% commission (a third of Steam's).  Naturally, publishers saw Discord as an opportunity to secure a greater revenue share on the distribution of their games and in-game products and were incentivized to steer gamers to the platform with favorable pricing.  Valve stymied this with the PMFN, barring publishers from offering discounts on Discord.

95.    Valve also has explicit rules setting forth the PMFN.  Valve's guidelines state emphatically: "You should use keys to sell your game on other stores in a similar way to how you sell your game on Steam.  It is important that you don't give Steam customers a worse deal than Steam Key purchasers.[32] While nominally about Steam Keys, Valve has made clear to publishers that the same rules apply to all sales. In response to one inquiry from a game publisher, for example, Valve explained: "*We basically see any selling of the game on PC, Steam key or not, as a part of the same shared PC market- so even if you weren't using Steam keys,*

---

[32] Steamworks Documentation, *Steam Key Rules and Guidelines*, https://partner.steamgames.com/doc/features/keys (last visited Aug. 7, 2024).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1    *we'd just choose to stop selling a game if it was always running discounts of 75% off on one*

2    *store but 50% off on ours. . . ."*

3    96.    A prior version of the same guidance similarly stated: "You are welcome to

4    generate keys for resale with other retailers, including your own website. However, your product

5    must also be available for sale on Steam. If you are hoping to receive exposure to Steam

6    customers, the price on Steam will have to match prices elsewhere."[33] Valve threatened to delist

7    any developers (strip them of "exposure to Steam customers") if they offered consumers

8    discounts on rival platforms, even platforms offering better publisher economics.

9    97.    Publishers are reminded of these restrictions whenever they request Steam Keys,

10   with the online screen flows requiring that they confirm:  "I understand that I need to sell my

11   game on other stores in a similar way to how I am selling my game on Steam" and "I agree that I

12   am not giving Steam customers a worse deal." The publisher must also agree that "I understand

13   that while it's OK to run a discount on different stores at different times, I agree to give the same

14   offer to Steam customers within a reasonable amount of time." Again, as discussed above, Valve

15   enforces these rules against publishers not only for Steam Key games, but for all games.

16   98.    Valve also tells publishers that Valve enforces this provision to "*avoid a situation*

17   *where customers get a worse offer on the Steam store.*"[34] Put another way, Valve uses its PMFN

18   to prevent gamers from getting a better deal from any Steam Store competitors.

19   99.    Steam imposes the PMFN through more informal guidance as well.  Steamworks

20   Development is a forum where publishers interact with Valve employees. On this forum, when

21   one publisher asked Valve about the "rules regarding distributing/selling a game outside of

22   steam" in a thread called "Patreon and steam keys" dated July 2, 2017, "TomG" of Valve

23   explained how the policing system works: "*The biggest takeaway is, don't disadvantage Steam*

24   *customers.* For instance, it wouldn't be fair to sell your DLC [downloadable content] for $10 on

25

26

27   [33] Steamworks Documentation, *Steam Key Rules and Guidelines* (Sept. 1, 2017),
     https://web.archive.org/web/20170901192842/https://partner.steamgames.com/doc/features/keys.

28   [34] Steamworks Documentation, *Steam Key Rules and Guidelines*, *supra* note 33.

CLASS ACTION COMPLAINT - 25
Case No. 2:24-cv-01218
011258-11/2686081 V1



1    Steam if you're selling it for $5 or giving it as a reward for $5 donations. We would ask that

2    Steam customers get that lower $5 price as well."

3        100.    This response reflects the twisted "fairness" rationale Valve has used to justify its

4    PMFN.  There is nothing "unfair" about consumers receiving discounts game publishers wish to

5    provide them.  What is unfair is Valve's sustained efforts to prevent these discounts from

6    happening so that Valve can maintain its market dominance and 30% tax on gaming transactions.

7        101.    The same "TomG" also explained to another game publisher that the publisher

8    should "[t]hink critically about how your decisions might affect Steam customers, and Valve. *If

9    the offer you're making* fundamentally *disadvantages someone who bought your game on Steam*,

10   it's probably not a great thing for us or our customers (even if you don't find a specific rule

11   describing precisely that scenario)." In that same thread, TomG responded to a question by

12   stating: "*we usually choose not to sell games if they're being sold on our store at a price notably

13   higher than other stores.* That is, we'd want to get that lower base price as well, or not sell the

14   game at all."

15       102.    Additional examples of Valve's PMFN enforcement abound.  On December 3,

16   2018, for example, a Steam account manager, Tom Giardino, reportedly told publisher Wolfire

17   that Steam would delist any games available for sale at a lower price elsewhere, whether or not

18   using Steam keys. A Valve employee told another developer that if he "brought a particular other

19   game of [his] to Steam, it would need to be equivalently priced. This was regardless of whether

20   the non-[S]team version use Steam technology[,] [*i.e.*], a completely standalone version would

21   have to be the same price as the Steam version."

22       103.    Valve has gone so far as to prevent publishers from telling consumers about its

23   30% fee. While publishers can advertise alternative storefronts, publishers cannot disclose to

24   gamers the amount of the commission Valve collects. This prevents even more subtle price

25   steering to stores where the publisher may be able to collect a better revenue share.

26

27

28

**B.      Valve restricts competition by tying PC In-Game Payment Processing to PC Game Distribution.**

104.     Once a game has been purchased in the PC Game Distribution market, publishers can offer enhancements within their games for purchase.  These in-game transactions (what Valve calls "Microtransactions"), when offered, cannot be accomplished through a PC game distribution platform.  Rather, to complete these transactions, publishers must use a PC In-Game Payment Processing service.

105.     For games obtained from the Steam Store, there is no technological reason why publishers could not provide, or consumers could not select between, different PC In-Game Payment Processing services.  Valve, however, strictly forbids this.  It mandates that Steam consumers only use their Steam Wallet for in-game purchases, and that developers offer payment processing through a set of Valve "microtransaction APIs."  The Valve publisher guidelines are explicit on this:[35]

**In-Game Purchase Requirements**

For any in-game purchases, you'll need to use the microtransaction API so Steam customers can only make purchases from the Steam Wallet. You can learn more about how to complete this integration in the Microtransactions Implementation Guide.

You can use the Steam Wallet to purchase individual items or to purchase your in-game currency.

106.     By mandating the use of its own payment processing tools, Valve ensures that it can extract its 30% tax from all in-game purchases on games distributed through Steam.  This way, Valve gets its tax both at the front end (when the game is purchased) and at the back end, when the game is played.

107.     This tie-in not only helps maintain Valve's monopoly in the PC In-Game Payment Processing Market, it also constitutes an unlawful tying arrangement that (standing alone) violates Section 1 of the Sherman Act.

---

[35] Steamworks Documentation, *Microtransactions*, *supra* note 21.

CLASS ACTION COMPLAINT - 27
Case No. 2:24-cv-01218
011258-11/2686081 V1



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**C.     Valve's PMFN and tying conduct have severe anticompetitive effects.**

    **1.     Valve's PMFN suppresses competition and causes consumers to pay higher prices.**

108.     There are well-known anticompetitive effects that result from the imposition of MFN clauses by companies with market power, including higher prices to consumers.[36] MFN provisions mandate that suppliers provide equally favorable terms to the company imposing the MFN as granted to any of its rivals.

109.     Platform MFNs (or "PMFNs") are MFNs imposed by platforms.  They require that providers using the platform not offer their products or services at a lower price on other platforms. Economists increasingly recognize that PMFNs in particular can harm competition and consumers by "keeping prices high and discouraging the entry of new platform rivals."[37] PMFNs guarantee that other platforms cannot charge a "lower final price, not because the focal platform has worked to ensure that it has the lowest cost, but rather because it has contracted for competitors' prices to be no lower."[38]

110.     By imposing a PMFN, Valve ensures that the retail prices set in the Steam Store are equal to or better than the prices offered in any rival distributor's storefront. Thus, Valve's PMFN gives Valve the ability to prevent price competition from rival storefronts.

111.     PMFNs disincentivize sellers (here, game publishers) from offering low prices in any channel, because discounts must be offered to all buyers.[39]

112.     PMFNs also make it difficult to profitably enter the market to compete with an incumbent platform imposing the PMFN.  The main way a rival platform might compete is by offering lower platform fees to attract sellers who could discount their own prices (due to the lower platform fees) to generate additional volume at potentially higher margins.  But if the

---

[36] *See* generally Steven C. Salop & Fiona Scott Morton, *Developing an Administrable MFN Enforcement Policy*, 27 ANTITRUST ABA No. 2 15, 18 (Spring 2013).

[37] Jonathan B. Baker & Fiona Scott Morton, *Antitrust Enforcement Against Platform MFNs*, 127 YALE L.J. 2176, 2201 (May 2018) ("Baker I").

[38] *Id*. at 2178.

[39] *Id*. at 2179.



incumbent platform has a PMFN, the seller cannot differentiate its prices across platforms and "[t]his parity undermines the entrant's business model by preventing it from making an attractive offer to customers."[40]  This is precisely how Valve's PMFN operates.  It requires any game publishers selling through the Steam Store to set the same price on any rival or entrant's platform.  This prevents such rival or entrant platforms from making attractive offers to both publishers and consumers.

113.    When a company imposes a PMFN prohibiting lower prices on other platforms, that provision "serves to suppress competition on the crucial dimension of price[,]" and keeps new entrants from undercutting the dominant platform's commission, and, but for the PMFN, driving consumers to the rival platform.[41]

114.    Economic modeling demonstrates that when a dominant platform requires its sellers to agree to a PMFN, (a) there are higher platform fees; (b) there are higher retail prices; and (c) firms with lower-cost models are discouraged from entry.[42] As shown in the Boik & Corts model, for example, a lower price entrant (such as Discord, discussed herein) cannot successfully enter because the PMFN does not allow the entrant to lower prices to attract both consumers and publishers.[43]

115.    Additionally, PMFNs "tend to raise industry prices" because they "kill a retailer's incentives to compete in the terms of trade that it offers suppliers. The reason is that a retailer who raises the commission it charges . . . knows that the price set through its store will not increase relative to that at other stores. . . . This means that suppliers cannot asymmetrically

---

[40] *Id*. at 2180.

[41] Benjamin Edelman & Julian Wright, *Price Restrictions in Multi-sided Platforms: Practices and Responses*, 10 COMPETITION POL'Y INT'L 86 (Jan. 30, 2015).

[42] Andre Boik & Kenneth S. Corts, *The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry*, 59 J.L. & ECON. 105, 113–29 (Feb. 2016).

[43] *See also, e.g.*, Amelia Fletcher & Morten Hviid, *Broad Retail Price MFN Clauses: Are They RPM "At Its Worst"?*, 81 ANTITRUST L.J. 1, 74 (2016) ("[MFNs] can restrict entry at the retail level. Specifically, they can disadvantage potential retail competitors with low-end business models by eliminating such an entrant's ability to win customers away from the incumbent through cutting its own margin and offering lower prices.").



adjust their prices to divert demand towards retailers offering more attractive contractual terms."[44]

116.    PMFNs thus "harm competition by assisting an incumbent in foreclosing the entry or expansion of rivals."[45] PMFNs harm competition "by making it impossible for a dominant incumbent firm's rivals, including entrants, to bargain . . . for a low price."[46]

117.    Real world examples show that, when PMFNs are banned, prices to consumers fall.[47] The leading hotel-booking site in the EU responded to an MFN ban by introducing quality improvements to the service it provided,[48] suggesting online platform competition increased when PMFNs were banned.

118.    The impact of Valve's PMFN is evident in game prices across platforms. It would be in the economic self-interest of a publisher to sell its games for lower retail prices through lower-commission distributors. If another distributor charges a lower commission, the publisher could lower prices on the rival distributor, steering customers towards the rival distributor, or compel Valve to lower Valve's own supracompetitive commissions.

119.    Due to Valve's PMFN, however, prices are remarkably consistent across distributors, regardless of each distributor's platform fees. To illustrate, the following chart shows prices from the Steam Store, the Epic Games Store, and GameStop websites as of August 2024.  Many more examples are available, with these examples being provided only for illustrative purposes.

---

[44] Justin P. Johnson, *The Agency Model and MFN Clauses*, 84 REV. ECON. STUD. 1153–54 (Jan. 2017).

[45] Jonathan B. Baker & Judith A. Chevalier, *The Competitive Consequences of Most-Favored- Nation Provisions*, 27 ANTITRUST MAG. 24 (Spring 2013) ("Baker II").

[46] *Id.*

[47] Andrea Mantovani, et al., *The Dynamics of Online Hotel Prices and the EU Booking.com Case*, NET Institute Working Paper No. 17-04 (2017) at 2, http://ssrn.com/abstract_id=3049339 [http://perma.cc/W9K9-Y546].

[48] *See Id.* at 6 tbl.1.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

| Game Title | Price on Steam | Price on Epic Games Store | Price on GameStop |
|---|---|---|---|
| Horizon Forbidden West™ Complete Edition | $59.99 | $59.99 | $59.99 |
| RimWorld | $34.99 | $34.99 | N/A |
| Crosshair X | $7.99 | $7.99 | N/A |
| Red Dead Redemption 2 | $59.99 | $59.99 | $59.99 |
| Final Fantasy VII Remake Intergrade | $69.99 | $69.99 | $69.99 |
| Disco Elysium - The Final Cut | $39.99 | $39.99 | N/A |
| Hades II | $29.99 | $29.99 | N/A |
| The Last of Us™ Part I | $59.99 | $59.99 | $59.99 |
| Pacific Drive | $29.99 | $29.99 | $29.99 |

120.     Uniform pricing across platforms with different commissions is not in the economic interests of consumers, who would benefit from discounts on lower-cost platforms. The following chart illustrates how normal differential pricing (which the PMFN prevents) would be profitable to publishers and provide better retail prices to consumers:

| | STEAM | RIVAL PLATFORM |
|---|---|---|
| **Platform Fee** | 30% | 12% |
| **Price to Consumer** | $30.00 | $25.00 |
| **Developer Net Revenue (Price to Consumer – Platform Fee)** | $21.00 | $22.00 |

121.     As shown, at a 12% commission, a game publisher could slash its prices from $30.00 to $25.00 and still earn more profit per unit sold.  The consumer would pay $5 less—an enormous 17% savings—and be better off.  The developer would earn $1 more and be better off. The rival platform would be better off because it would win the sale and earn a profit-generating 12% commission.  The only party that would not benefit would be Valve, because it would lose the sale and earn nothing.  Without the PFMN, Valve would face this type of competition again

1    and again, and be forced to compete by lowering its commission down to the competitive level,

2    with game prices falling commensurately.

3        **2.    Valve's tying conduct impedes competition and causes consumers to pay higher prices.**

4        122.    In a competitive market for PC In-Game Payment Processing, a range of payment

5    processing services could compete with Valve and the 30% tax it imposes for in-game payment

6    processing.  There would be ample opportunity for competition to unfold, and it would be

7    expected to be vigorous.  For one, there are many established firms that offer payment

8    processing.  Some offer it across digital markets, e.g., PayPal.  Others are specific to gaming

9    platforms, e.g., Xsolla.  These firms, and others, would be highly incentivized to compete in the

10   lucrative PC In-Game Payment Processing market if they could access the dominant platform,

11   Steam.  In addition, most payment processors charge per-transaction fees that come nowhere

12   near the 30% Valve imposes.  Most payment processors' all-in rates hover in the 4% range.

13   Accordingly, entrants would have ample room to undercut Valve's fees to appeal to publishers

14   and consumers.

15       123.    Facing competition from rival payment processors, Valve would never be able to

16   sustain its 30% tax on in-game purchases.  As with any competitive market, Valve's pricing

17   would be driven down toward marginal costs, which in the case of payment processing is

18   infinitesimal.  Because payment processing fees, like all costs, are baked into the prices

19   publishers charge for in-game products, consumers would be the ultimate beneficiaries of the

20   lower payment processing fees that would prevail in a PC In-Game Payment Processing market

21   operating without Valve's tying conduct.

22   **IX.   VALVE'S ANTICOMPETITIVE RESTRAINTS HAVE PREVENTED RIVAL**
23   **       PLATFORMS FROM SEIZING SIGNIFICANT MARKET SHARE.**

24       124.    Many sophisticated and well-financed companies have tried to dethrone Steam by

25   creating alternative channels for PC Game Distribution and PC In-Game Payment Processing.

26   None has put a meaningful dent in Steam's dominant position.  They have failed not because

27   Steam provides a superior product to either publishers or consumers.  Indeed, rivals have

28   developed gaming platforms that offered equivalent or better functionality, with lower



commissions.  Rivals have failed because Valve's PMFN and tying conduct prevent meaningful competition on the merits.

## A.     Discord

125.    Discord is an application that offers text messaging, voice, and video calling for gamers to communicate with friends while playing a game.[49] Discord experienced rapid growth after launching in 2015, reporting 8.9 million daily users in 2017 and 100 million daily users in 2020.[50]

126.    In August 2018, Discord unveiled a game distribution platform in an effort to enter the relevant markets. It was described as the "biggest threat [Steam's] faced in years."[51] Discord in many ways was well-positioned to compete, since it already had an active gamer userbase using its platform for voice communications and social networking.  Discord also offered gamers and publishers promotions, such as exclusive periods of curated games being offered for free.[52] Discord also allowed all developers—regardless of size—to self-publish games.

127.    But most importantly, Discord offered superior economics—specifically a 10% standard commission rate.[53]  In a challenge to Valve's pricing, Discord openly questioned, "Why does it cost 30% to distribute games?"[54] Discord concluded that it "[t]urns out, it does not cost 30% to distribute games in 2018."[55] Discord settled on 10% because it "covers [its] operating

---

[49] Kaylee Fagan, *Everything you need to know about Discord, the app that over 250 million gamers around the world are using to talk to each other*, BUSINESS INSIDER (Oct. 12, 2020), https://www.businessinsider.com/how-to-use-discord-the-messaging-app-for-gamers-2018-5.

[50] *Id.*

[51] Stefanie Fogel, SuperData: *Discord Is a 'Major Threat' To Steam*, VARIETY (July 2, 2018), https://variety.com/2018/gaming/news/superdata-discord-vs-steam-1202863853/.

[52] Nelly, *Discord Store Global Beta Is Live!*, MEDIUM (Oct. 16, 2018), https://medium.com/discord-engineering/discord-store-global-beta-is-live-38bfd044d648.

[53] Discord, *supra* note 7; Austen Goslin, *In the race to beat Steam, the Discord Store just made a huge move*, POLYGON (Dec. 14, 2018), https://www.polygon.com/2018/12/14/18140790/discord-storeself-publishing-revenue-split.

[54] Discord, *supra* note 7.

[55] *Id.*

CLASS ACTION COMPLAINT - 33
Case No. 2:24-cv-01218
011258-11/2686081 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

costs," while adding, "we'll explore lowering it by optimizing our tech and making things more efficient."[56]

128.    Despite all these factors, Discord never gained traction.  By early 2019, Discord started "downscaling" its efforts in favor of a model where gamers would gain access to a pool of games for a monthly fee, a service called Nitro.[57] By October 2019, Discord announced the Nitro offering would be shut down.[58]

129.    Valve's anticompetitive conduct made it impossible for Discord to meaningfully compete.  Due to Valve's PMFN, publishers could not use price discounts or content improvements to steer gamers to Discord. If they did, they would be removed from the must-have Steam platform for violating the PFMN.  As a result, Discord was unable to achieve the scale necessary to challenge Valve's monopoly or discipline its supracompetitive prices.

130.    Adding insult to injury, Valve proceeded to copy many of Discord's most innovative features.  For example, following Discord's lead, Valve introduced "Steam Chat," which provides a friends list, secure voice chat, and group channels. Industry analysts recognized that this "update takes many cues from Discord, including a suspiciously similar user interface" that looks "almost exactly the same."[59]

**B.    Microsoft, Amazon, Google**

131.    In 2012, Microsoft released the Microsoft Store (formerly known as Windows Store) as its digital distribution platform, including for PC games.  But despite its vast resources and unparalleled experience in digital markets, Microsoft was not able to gain a substantial market share from Steam.  And recent events show that the competition has all but ceased, with Microsoft and Steam curiously collaborating in several areas.

---

[56] *Id.*

[57] James Batchelor, *Discord Game Store refocuses on Nitro subscription, devs can now sell games directly*, GAMEINDUSTRY.BIZ (Mar. 14, 2019), https://www.gamesindustry.biz/discord-game-store-refocuses-on-nitro-subscription-as-servers-allow-devs-to-sell-games-directly

[58] Nelly, *What's Coming for Nitro*, DISCORD (Sept. 12, 2019), https://discord.com/blog/whats-coming-for-nitro.

[59] Sean Wolfe, *The new and improved Steam Chat is here to take on Discord — here's how the two apps compare*, BUSINESS INSIDER (July  28, 2018), https://www.businessinsider.com/steam-chat-update-vs-discord-2018-7.


1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

132.    Notably, in May 2019, Microsoft announced that it would bring more games to Steam. As an insider remarked on Microsoft's surrender, Microsoft "has given up entirely on that vision . . . to dethrone Steam."[60]  Then in March 2021, Microsoft acquired Bethesda Games, a company that both made PC games and operated a nascent competitor to Steam, the Bethesda Launcher. In February 2022, Microsoft decided to shutter Bethesda, but rather than transition Bethesda games to Microsoft's own digital storefront, the Microsoft Store, Microsoft migrated those games and accounts to its supposed competitor Steam.

133.    Amazon, through the Twitch Store, opened a joint platform/storefront in April 2017, heralded as "one of the biggest challenges yet to Steam."[61] It was shuttered 18 months later.[62]

134.    Google also launched a competitive offering, Google Stadia, meant to be "the future of gaming."[63] Yet a February 26, 2021 article announced it has "absolutely crumbled under expectations."[64]

C.    **Epic Games Store**

135.    The Epic Games Store ("EGS") is a platform and store offered by games publisher Epic.  Despite significant investment, Epic has been unable to mount a significant challenge to Steam's dominance due to Valve's anticompetitive conduct.

---

[60] Nick Statt, *Microsoft will distribute more Xbox titles through Steam and finally support Win32 games*, THE VERGE (May 30, 2019), https://www.theverge.com/2019/5/30/18645250/microsoft-xbox-game-studios-publishing-valvesteam-32-bit-windows.

[61] Rich McCormick, *Twitch will start selling games and giving its streamers a cut*, THE VERGE (Feb. 27, 2017), https://www.theverge.com/2017/2/27/14748896/twitch-sell-games-streamers-cut.

[62] Bryon Rose, *Twitch Game Store Shutting Down After November 27*, GAMEREVOLUTION (Nov. 16, 2018), https://www.gamerevolution.com/news/458393-twitch-game-store-shutting-down.

[63] Ian Sherr, *Google Stadia wants to be the future of gaming. So do Microsoft, Sony and Amazon,* CNET (Dec. 17, 2019), https://www.cnet.com/news/google-stadia-wants-to-be-the-future-of-gaming-so-do-microsoft-sony-and-amazon/.

[64] Cade Onder, *Damning Google Stadia Report Reveals Why It's Failing*, SCREEN RANT (Feb. 26, 2021), https://screenrant.com/google-stadia-damning-report-failing/.



136.    Epic is theoretically well-positioned to compete.  Epic is behind the gaming phenomenon, Fortnite, which earned over $4 billion between its launch in September 2017 and the summer of 2019.[65]  Accordingly, just as Steam used its own popular game titles to launch the Steam Store, Fortnite's massive user base gives Epic a strong foundation to anchor a PC games store.  Epic was also motivated to offer a more equitable (yet still profitable) business model because, as Epic's CEO explained, "[s]tores extract an enormous portion of game industry profits and are ripe for disruption."[66]

137.    To attract publishers to its new storefront, Epic offered a much lower commission than the Steam Store: 12% instead of Valve's 30%. As Epic has stated in court documents, "Epic decided to charge developers a 12% revenue share after it concluded that 12% would be competitive, sufficient to cover its costs of distribution and allow for further innovation and investment in EGS."[67] Thus, like Discord found with its own 10% commission, Epic determined that a 12% commission was more than sufficient to cover costs and sustain profits needed to reinvest to innovate its storefront.

138.    EGS spent hundreds of millions on marketing and incentives to gain market share. But, even with these aggressive tactics, the EGS Store has been unable to move a significant share of the market away from Valve. Analyzing 2019 figures, one industry analyst explained that, despite its dogged efforts, EGS likely had a market share "a little above 2%."[68] Epic's sales have not increased significantly since, barely keeping abreast with inflation (if that).  Epic's year-end reports reveal that it generated $251 million in revenue from third-party games in 2019, with that number increasing only to $310 million by the close of 2023.

---

[65] Jason M. Bailey, *Fortnite Maker Wants to Sell More Games, and Build a Platform to Do It*, N.Y. TIMES (Aug. 27, 2019), https://www.nytimes.com/2019/08/27/business/steam-epic-games-store.html.

[66] *Id.*

[67] Findings of Fact and Conclusions of Law Proposed by Epic Games, Inc. at 134, *Epic Games, Inc. v. Apple, Inc.*, No. 4:20-cv-05640-YGR (N.D. Cal. Apr. 7, 2021), ECF. No. 407, https://cand.uscourts.gov/wp-content/uploads/cases-of-interest/epic-games-v-apple/Epic-Games-20-cv-05640-YGR-Dkt-407-Epic-Games-Proposed-Findings-of-Facts-and-Conclusions-of-Law.pdf.

[68] Avihay Hermon, *Epic Games Store, behind the numbers*, MEDIUM (Feb. 6, 2020), https://medium.com/@h.avihay/epic-games-store-behind-the-numbers-fe7ddef4e00c.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

139.     Valve's anticompetitive conduct is a major reason for EGS's failure. Because of Valve's PMFN, other publishers on EGS cannot discount their prices below those offered on Steam, preventing Epic from attracting users and building market share. Due to fear of retaliation from Valve, a publisher's only method of avoiding the PMFN is dropping Steam distribution entirely. But that is not an economically viable strategy for virtually all publishers, and therefore publishers have no choice but to comply with the PMFN. The result is that Epic's lower commission structure has not (and cannot) discipline Valve's supracompetitive 30% commission.

## X.     VALVE'S ANTICOMPETITIVE PRACTICES DIRECTLY HARM CONSUMERS

140.     The goal of the antitrust laws is "to protect the process of competition for the benefit of consumers, making sure there are strong incentives for businesses to operate efficiently, keep prices down, and keep quality up."[69] The Sherman Act is a "comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958). "[T]he policy unequivocally laid down by the Act is competition." *Id.*

141.     Valve's PMFN and tying arrangement have blocked price competition and inhibited the ability of rival stores and platforms to function in a freely competitive market. This has allowed Valve to maintain its dominance in the relevant markets and maintain grossly inflated fees for game distribution and payment processing services, as alleged herein.

142.     While Valve assesses its 30% fee on game publishers, the publishers have a recourse.  Like any cost, publishers can (and do) build Valve's fees into the prices they charge consumers for PC games and in-game payment processing.  This is basic economics.  For firms to remain profitable, they must recoup their costs.  Game publishers are no different.  In a market operating without Valve's PMFN, competition between platforms would drive platform fees down across the market, resulting in lower marketwide prices for PC games and in-game

---

[69] FTC, *The Antitrust Laws*, https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/antitrust-laws (last accessed Aug. 7, 2024).



purchases.  With lower platform fees, publishers would be incentivized to drop prices to spur

additional sales volume.  As addressed in greater detail above, these incentives cannot be acted

upon under the PMFN, and consumers are thereby deprived of discounts that would be available

to them in a world with no Valve PMFN.

143.    Valve's anticompetitive conduct also decreases output.  By inflating prices, Valve

has reduced demand for PC games and in-game products.  The lower prices that would prevail in

a competitive market would increase demand, leading to more transactions in both relevant

markets, i.e., more output.

144.    Valve's conduct has also decreased quality in the market to the detriment of

consumers.  Facing no meaningful competition, Valve has little incentive to innovate its platform

to offer consumers the highest quality experience and security.  Notably in this regard, with very

few employees (roughly 80), and limited reinvestment in security, the Steam platform has

undeniable cybersecurity vulnerabilities.  By way of example, in 2011 hackers stole "information

about Steam transactions between 2004 and 2008" that contained "names, email addresses,

encrypted billing addresses and encrypted credit card information," which forced Valve CEO

Gabe Newell to advise Steam Platform users to "watch your credit activity and statements."[70]

By 2015, 77,000 Steam user accounts were being "hijacked and pillaged each month."[71] And by

2016, a cottage industry of "Steam Stealer" malware had developed that allowed criminals

around the world to defraud Steam users, transforming the Steam Platform "into the devil's

playground."[72] In 2019, Valve agreed to fix a "zero-day" security flaw that had potentially

exposed tens of millions of Steam users' computers to hackers, but only after Valve had been

[70] Gabe Newell, *Message from Gabe to Steam Community*, STEAM (Feb. 10, 2012),
https://store.steampowered.com/oldnews/7323.

[71] Steam, *Security and Trading*, (Dec. 9, 2015), https://store.steampowered.com/oldnews/
19618.

[72] Santiago Pontiroli & Bart Parys, *Steam Stealers*, KASPERSKY LAB (Mar. 2016),
https://media.kasperskycontenthub.com/wp-content/uploads/sites/43/2018/03/07191212/
Steam_Stealers_research_ENG.pdf.



publicly pressured to do so.[73] Later than same year, Valve halted trading and selling of digital items for one video game because "nearly all key purchases that end up being traded or sold on the marketplace are believed to be fraud-sourced" by "worldwide fraud networks" engaged in money laundering.[74]

145.    Valve has also explicitly disclaimed responsibility for moderating offensive game content on the Steam Store. In 2018, Valve announced that "we've decided that the right approach is to allow everything onto the Steam Store, except for things that we decide are illegal, or straight up trolling."[75] In 2019, Valve allowed "Rape Day" to be published on the Steam Store, which enabled gamers to "verbally harass, kill, and rape women as you choose to progress the story," and only removed the game after widespread public outcry.[76] The National Center on Sexual Exploitation has regularly denounced Valve, including its ineffective parental controls on the Steam Store.[77]

146.    Valve also harms consumers by incentivizing large publishers not to compete.  In particular, certain large publishers (e.g., Ubisoft among others) have periodically experimented with delisting games from Steam such that they can be offered at discounts to consumers directly (e.g., through their own stores) or through rival platforms offering lower fees.  While beneficial to consumers, this poses a competitive threat to Steam because Steam gets no revenue share for

---

[73] Catalin Cimpanu, *Researcher publishes second Steam zero day after getting banned on Valve's bug bounty program*, ZDNET (Aug. 21, 2019), https://www.zdnet.com/article/researcher-publishes-second-steam-zero-day-after-getting-banned-on-valves-bug-bounty-program/.

[74] Catalin Cimpanu, *Valve says that nearly all CS:GO key resales are being used to launder money*, ZDNET (Oct. 29, 2019), https://www.zdnet.com/article/valve-says-that-nearly-all-csgo-key-resales-are-being-used-to-launder-money/; *see also* Steam, *Security and Trading*, *supra* note 72 ("Account theft has been around since Steam began, but with the introduction of Steam Trading, the problem has increased twenty-fold as the number one complaint from our users.").

[75] Steam, *Who Gets To Be On The Steam Store* (June 6, 2018), https://steamcommunity.com/games/593110/announcements/detail/1666776116200553082.

[76] Patricia Hernandez, *Steam game about raping women will test Valve's hands-off approach*, POLYGON (Mar. 4, 2019), https://www.polygon.com/2019/3/4/18249916/rape-day-steam-valve.

[77] The Nat'l Ctr. on Sexual Exploitation, *Steam "Family View" Safety Features Fail to Protect Kids from Rape Video Games*, NCSE (Feb. 3, 2020), https://endsexualexploitation.org/articles/steam-family-view-safety-features-fail-to-protect-kids-from-rape-video-games/.

CLASS ACTION COMPLAINT - 39
Case No. 2:24-cv-01218
011258-11/2686081 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1    sales off its platform, and such off-platform sales put downward pressure on the fees Steam can

2    impose.

3        147.    To disincentivize this type of large publisher competition, Steam adopted in 2018

4    a set of pricing incentives to keep large publishers' titles on Steam and subject to the PMFN.

5    Under this structure, large publishers pay Valve 25% on Steam sales over $10 million, and 20%

6    on sales above $50 million.  Tellingly, Steam's incentive structure is the inverse of what other

7    platforms offer.  Normally, app distribution platforms offer reduced commissions to *small*

8    developers in recognition of their low margins and to encourage their involvement on the

9    platform.  Both Apple and Google offer a reduced 15% fee tier to small developers with annual

10   revenues below a set threshold.  Tellingly, Steam does the opposite.  It essentially refunds fees

11   only to its largest publishers.

12       148.    Steam gives its largest publishers a better deal for a reason.  It is because these are

13   the only developers who could conceivably compete with Steam, and Valve's volume discounts

14   discourage them from doing so.  As Steam's own announcement of this pricing scheme stated,

15   the goal of the incentives was to reward "developers of big games" by "aligning their interests

16   with Steam."[78]  The reduced commissions have provided large publishers with millions of dollars

17   in additional revenue, mitigating incentivizes they may otherwise have to compete with Steam by

18   self-distributing or distributing exclusively through non-Steam channels.

19       149.    In addition to increasing prices, while reducing output and innovation, Valve has

20   maintained its monopoly and engaged in other anticompetitive practices that impose unique

21   harms on consumers.  Two examples are (1) Valve's use of Steam Keys and (2) and Valve's

22   efforts to coordinate game pricing.

23   **A.    Valve uses Steam Keys to protect its monopoly and overcharge consumers.**

24       150.    When the Steam Store launched, PC games were still commonly distributed via

25   compact discs ("CDs").  The consumer would purchase a CD and install the PC game on their PC

26

27   ───────────────
     [78] Steamworks Press Release, *New Revenue Share Tiers and other updates to the Steam*
28   *Distribution Agreement*  (Nov. 30, 2018), https://steamcommunity.com/groups/steamworks/
     announcements/detail/1697191267930157838.

CLASS ACTION COMPLAINT - 40
Case No. 2:24-cv-01218
011258-11/2686081 V1



1  computer.  Publishing games on CDs is not particularly expensive for game developers, costing

2  less than a dollar and far less than Steam's 30% commission.  Game developers' ability to self-

3  publish and distribute games via CD was thus a competitive threat to the Steam Store.

4      151.    In a competitive market, the savings from CD-based distribution would be

5  reflected in the retail prices consumers pay, incentivizing consumers to move purchases away

6  from high commission stores like Steam. Moreover, as consumers grew accustomed to making

7  physical purchases online through eCommerce retailers like Amazon, the competition from this

8  alternative PC games sales model would only have increased.

9      152.    Valve mitigated this threat through the use of Steam Keys.

10      153.    Steam Keys are codes issued by Valve that users can activate to play a PC game

11  on the Steam Gaming Platform.  Steam Keys are similar to a gift card or a voucher designed for

12  use on a website. Whether the code is physically printed on a card and packaged in a game box,

13  or contained in a digital message like an email, the consumer uses the code on Steam to obtain

14  the product associated with the code.  Valve provides publishers with a limited number of Steam

15  Keys and has discretion to meter their use, including by voiding them after issuance.

16      154.    To ward off competitive threats from alternative distribution modes, Steam made

17  Steam Keys conditionally available to publishers for free (i.e., no 30% or other Valve

18  commission), albeit in limited numbers, so long as the publishers agreed not to pass through cost

19  savings to consumers.  This model has significant anticompetitive effects, particularly on

20  consumers.

21      155.    *First*, while developers benefit from higher margins on sales made with Steam

22  Keys (because Valve does not charge any commission), publishers can distribute with Steam

23  Keys only on the condition that they abide by Valve's PMFN and not discount prices to

24  consumers.  As addressed above, Valve is explicit in its requirement that Steam Keys be sold for

25  the same (or higher) price as the Steam Store. Game publishers must specifically agree to "sell

26  your game on other stores in a similar way to how you sell your game on Steam. It is important

27  that you don't give Steam customers a worse deal than Steam Key purchasers." (emphasis

28  original)



156.    This PMFN clause directly inhibits price competition and prevents consumers from receiving discounts game developers would otherwise be incentivized to provide when selling 0% commission Steam Keys.

157.    **Second**, Steam uses Steam Keys to protect its monopoly.  One way a gaming platform can expose consumers to its digital platform is by selling digital codes for games (such as Steam Keys) through physical retail outlets.  In this way, digital codes like Steam Keys provide an access point into a platform, particularly for conventional shoppers accustomed to buying boxed games (or gifting boxed games) from physical retailers.

158.    For example, if a parent shopping at Walmart were to buy his or her child an Epic Games Store game key, that child is likely to enter the Epic Games Store ecosystem and become invested in that platform.  That is a customer Steam would have to win back.

159.    By giving its Steam Keys to publishers for free—i.e., at a loss—Valve has ensured that this type of competition in the distribution of physical game keys does not meaningfully evolve.  Given the option to distribute through their games through free Steam Keys, developers have minimized incentivize to physically distribute game codes offered by any competing platform.

160.    By ensuring that the physical code distribution channel is entirely dominated by Steam Keys that Valve dumps below cost, Valve prevents potential competitors from reaching new customers by profitably selling their own physically printed digital codes.

**B.    Valve advises publishers not to engage in price competition and facilitates price coordination.**

161.    Because Valve extracts 30% from sales on Steam, Valve does not stand to benefit from vigorous price competition on its platform.  If Steam publishers actively seek to undercut each other's prices for competing game titles and in-game products, that drives total sales revenues down and, with it, Valve's commission revenue.  Thus, while consumers benefit from active price competition among publishers, Valve wants prices on its platform to remain high, particularly because, with the PMFN, high prices on Steam must be matched elsewhere, leaving consumers no cheaper distribution channel into which they could divert sales.

CLASS ACTION COMPLAINT - 42
Case No. 2:24-cv-01218
011258-11/2686081 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

162.    It is similarly profitable for game publishers to avoid vigorous price competition with one another.  While the sheer number of publishers on Steam should make price coordination difficult, Valve provides price "recommendations" and guidance that serve this function.  In particular, any time a publisher sets or adjusts a price for a game or in-game product offered through Steam, it must submit the "proposed" price to Valve for approval.  Valve's guidance specifically states that, upon receipt of a proposed price, Valve will not approve any price less than $0.99 and will "recommend pricing strategies based on our experience and may suggest prices based on currency conversions and other factors."[79]

163.    In proposing a price, publishers are instructed by Valve to evaluate "[h]ow are games of a similar nature priced?" and that setting prices is "*not about trying to undercut competition with a lower price*."[80]

164.    Not only are publishers cautioned by Valve not to "undercut competition," they know when receiving a "recommended" price from Valve that their competitors are also receiving the same recommendations.  Publishers are thus strongly incentivized to accept Valve's recommended prices.

165.    Publishers are also prohibited from changing their prices within 30 days of a game's release, which further undermines competition and facilitates interdependent pricing by game publishers.  This "post and adhere" pricing system gives game publishers visibility into competitor pricing *with* assurance that the prices for new releases (which are often the most popular titles on the Steam Store) will remain stable for a substantial period.  This prevents competitive price adjustments and has the effect of coordinating prices across Steam's platform.  The anticompetitive effects of this type of "post and adhere" pricing are well-recognized by leading antitrust authorities.  *See* Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 2024 ("Agreements to post [prices] *and adhere* are inherently dangerous and should be regarded as illegal per se.").

---

[79] *See* Steamworks Documentation, *Pricing*, available at: https://partner.steamgames.com/doc/store/pricing.

[80] *Id.* (emphasis added).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

166.     Using the above tools, Valve is able to coordinate prices within a supracompetitive range it considers profitable.  In a market operating without Valve's pricing guidance, "recommendations," and "post and adhere" pricing system, competition on price would be more active across Steam and consumers would pay less for both PC games and PC in-game content.

## XI.     CLASS ACTION ALLEGATIONS

167.     Plaintiffs bring this action on behalf of themselves and, under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), as representatives of a Class defined as follows:

> All persons and entities who, directly or through an agent, purchased a PC game on the Steam Store, or purchased an in-game product from a game distributed on the Steam Store, in the United States and its territories. Excluded from the Class are Defendant and its employees, parents, and subsidiaries.

168.     The proposed Class can also be broken out into the following California subclass:

> All persons and entities who, directly or through an agent, purchased a PC game on the Steam Store, or purchased an in-game product from a game distributed on the Steam Store, in California. Excluded from the Class are Defendant and its employees, parents, and subsidiaries.

169.     When a gamer makes a purchase through the Steam Store, the gamer buys the game from Valve, paying the full retail price to Valve directly. There is no intermediary in the distribution chain between Valve and the consumer. Similarly, when a gamer uses a Steam Wallet to make an in-app purchase, that gamer pays Valve to complete the transaction.  Gamers are the immediate buyers from Valve, the Defendant in this antitrust case, and pay overcharges caused by inflated commissions directly to Valve.

170.     **Numerosity.** Members of the Class (and Sub-Class) are so numerous that joinder is impracticable. Plaintiffs do not know the exact size of the Class (and Sub-Class) but believe that there are at least millions of class members geographically dispersed throughout the United States.

171.     **Typicality.** Plaintiffs' claims are typical of the claims of the members of the Class (and Sub-Class). Plaintiffs and all members of the Class (and Sub-Class) were damaged by the



1    same wrongful conduct of Valve. Specifically, Valve's wrongdoing caused class members to pay

2    inflated prices to Valve.

3         172.    **Adequacy of Representation.** Plaintiffs are represented by counsel who are

4    experienced and competent in the prosecution of class action antitrust litigation. Plaintiffs and

5    their counsel have the necessary financial resources to adequately and vigorously litigate this

6    class action. Plaintiffs' counsel have no interests that are adverse to, conflict with, or are

7    antagonistic to the interests of the Class (or Sub-Class).

8         173.    Plaintiffs themselves will fairly and adequately protect and represent the interests

9    of the Class (and Sub-Class).  The interests of Plaintiffs are coincident with, and not antagonistic

10   to, those of the Class (and Sub-Class). Accordingly, by proving their own claims, Plaintiffs will

11   prove other class members' claims as well.

12        174.    There is an alignment of interests, and no conflict of interest. All class members

13   would benefit from robust competition in the relevant markets, and from reforming Valve's

14   illegal practices through injunctive relief.

15        175.    **Commonality.** There are many questions of law and fact common to the Class

16   (and Sub-Class), including, but not limited to:

17   •    whether there exists a relevant market for PC Game Distribution;

18   •    whether there exists a relevant market for PC In-Game Payment Processing;

19   •    whether Valve possesses monopoly power in these relevant markets;

20   •    whether Valve secured or has maintained monopoly power through anticompetitive
          means;

21
22   •    whether Valve has unlawfully tied PC In-Game Payment Processing to PC Game
          Distribution;

23
24   •    whether Valve's conduct has led to supracompetitive prices, reduced output, and/or
          reduced quality in the relevant markets; and,

25   •    whether consumers have been harmed by Valve's conduct and in what amount.

26        176.    The prosecution of separate actions by individual Class members would create a

27   risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for

28   Defendant.



177.    This class action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members is not only impracticable, but impossible. The damages suffered by many Class members are small in relation to the expense and burden of individual litigation, and therefore, it is highly impracticable for such Class members to individually attempt to redress the wrongful anticompetitive conduct alleged herein.

## XII.    INTERSTATE TRADE AND COMMERCE

178.    Valve's conduct has taken place in and affected the continuous flow of interstate trade and commerce of the United States, in that, inter alia: Valve has provided PC Game Distribution and PC In-Game Payment Processing throughout the United States; Valve has used instrumentalities of interstate commerce to provide PC Game Distribution and PC In-Game Payment Processing throughout the United States; in furtherance of the anticompetitive scheme alleged herein, Valve employees have traveled between states and have exchanged communications through interstate wire communications and via U.S. mail; and the anticompetitive scheme alleged herein has affected billions of dollars of commerce.

179.    Valve has inflicted antitrust injury by causing gamers to pay supracompetitive prices and to experience reduced output and quality in the relevant market.

## XIII.    FRAUDULENT CONCEALMENT

180.    Valve has taken affirmative steps to mislead Plaintiffs and the world about the existence of the PMFN, including in litigation filings.  In their publicly filed Answers in the *Wolfire* litigation (*Wolfire Games, LLC v. Valve Corp.*, No. 21-cv-0563 (W.D. Wash.)), Valve flatly denied that "it maintains or enforces a PMFN." At the motion to dismiss stage, Valve likewise represented that "No one has ever seen this shadow policy. . . . In short, Wolfire's claims regarding this alleged [PMFN] policy are thoroughly fanciful."

181.    Even in Valve's recent public filings opposing class certification, Valve continues to affirmatively represent that it has no PMFN.  It claims that "Plaintiffs' broad content parity component does not exist" and the "price parity component of the alleged PMFN is a fantasy."

182.    As explained above, however, these representations are false.  Yet by fraudulently and continuously denying the existence of the PMFN, Valve deterred Plaintiffs and members of



the proposed class from investigating and asserting their claims.  Moreover, as set forth above, the PMFN is imposed on game publishers through private communications and through a combination of written and unwritten rules, to which consumers are not privy.  Once Plaintiffs had information sufficient to suspect the existence of Valve's anticompetitive practice, they acted diligently to investigate and prosecute their claims.

183.    Valve's fraudulent concealment of the PMFN policy tolled the limitations period with respect to all claims asserted in this Complaint.

## XIV.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**SHERMAN ACT SECTION 2—MONOPOLIZATION OF THE PC GAME DISTRIBUTION MARKET**
**(15 U.S.C. § 2)**

184.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

185.    Valve has willfully acquired and maintained monopoly power in the relevant market for PC Game Distribution, by means of exclusionary and anticompetitive conduct, including but not limited to market-wide price controls, coercion of disloyal publishers, and blocking competitive strategies, as alleged herein.

186.    Through its PMFN, Valve has caused publishers to offer their games at the same price across the PC Game Distribution market, regardless of whether competing platforms charge a lower commission or otherwise charge lower prices than Valve.

187.    Valve's PMFN has impeded competitors' ability to attract more publishers and gamers to their PC Game Distribution platforms.

188.    In the absence of Valve's PMFN, rivals in the PC Game Distribution market would charge lower prices and force Valve to compete. Such competition would in turn lower prices on Valve's own PC Game Distribution platform, the Steam Store, benefitting consumers that utilized Valve's PC Game Distribution platform.

189.    Valve's conduct is not justified, because its conduct does not enhance overall efficiency or make the relevant market more efficient.



190.    Valve's conduct has had a substantial effect on interstate commerce.

191.    Plaintiffs and all those in the Class have been or will be injured in their property as a result of Valve's conduct.

192.    Plaintiffs and all those in the Class have suffered and will suffer injury of the type that the antitrust laws were intended to prevent. Plaintiffs have been and will be injured by the harm to competition as a result of Valve's conduct.

**SECOND CAUSE OF ACTION**

**SHERMAN ACT SECTION 2—ATTEMPTED MONOPOLIZATION
OF THE PC GAME
DISTRIBUTION MARKET (15 U.S.C. § 2)**

193.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

194.    In the relevant market for PC Game Distribution, Valve has engaged in exclusionary and anticompetitive conduct, including but not limited to market-wide price controls, coercion of disloyal publishers, and blocking competitive strategies, as alleged herein.

195.    Valve's conduct has had an anticompetitive effect in the relevant market for PC Game Distribution.

196.    Valve's conduct has no legitimate business purpose or procompetitive effect.

197.    Valve has engaged in that conduct with the specific intent of monopolizing the relevant market for PC Game Distribution.

198.    Valve has engaged in that conduct with a dangerous probability of monopolizing the relevant market for PC Game Distribution.

199.    In the absence of the Valve PMFN, rivals in the PC Game Distribution platform market would charge lower prices and force Valve to compete. Such competition would in turn lower prices on Valve's own PC Game Distribution platform, the Steam Store, benefitting consumers that utilized Valve's PC Game Distribution platform.

200.    Valve's conduct has had a substantial effect on interstate commerce.



201.    Plaintiffs and all those in the Class have been or will be injured in their property as a result of Valve's conduct.

202.    Plaintiffs and all those in the Class have suffered and will suffer injury of the type that the antitrust laws were intended to prevent. Plaintiffs have been and will be injured by the harm to competition as a result of Valve's conduct.

### THIRD CAUSE OF ACTION

### SHERMAN ACT SECTION 2—MONOPOLIZATION OF THE PC IN-GAME PAYMENT PROCESSING MARKET
### (15 U.S.C. § 2)

203.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

204.    Valve has willfully acquired and maintained monopoly power in the relevant market for PC In-Game Payment Processing by means of exclusionary and anticompetitive conduct, including but not limited to market-wide price controls, tying, coercion of disloyal publishers, and blocking competitive strategies, as alleged herein.

205.    Through the Valve PMFN, Valve has caused publishers to offer their games and in-game products at the same price across all PC game platforms, regardless of whether competing platforms charge a lower commission or otherwise charge lower prices than Valve.

206.    Valve's threats and coercion have impeded competitors' ability to attract more publishers and gamers to their platforms where they can provide PC In-Game Payment Processing.

207.    Valve has further willfully acquired and maintained monopoly power in the PC In-Game Payment Processing market by requiring that consumers use a Steam Wallet to make in-game purchases within games distributed through the Steam Store, foreclosing consumers from using, and publishers from providing, alternative options for PC In-Game Payment Processing.

208.    In addition to fostering and cementing Valve's monopoly in the PC In-Game Payment Processing market, Valve's prohibition on rival payment processing solutions and

CLASS ACTION COMPLAINT - 49
Case No. 2:24-cv-01218
011258-11/2686081 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

requirement that consumers use, and publishers offer, PC In-Game Payment Processing solutions offered by Valve constitutes an unlawful tie.

209.   In the absence of the Valve PMFN and Valve's tying conduct, rivals in the PC In-Game Payment Processing Market would charge lower prices and force Valve to compete. Such competition would in turn lower prices for Valve's own PC In-Game Payment Processing, benefitting consumers that utilized this service for in-game purchases.

210.   Valve's conduct is not justified, because its conduct does not enhance overall efficiency or make the relevant market more efficient.

211.   Valve's conduct has had a substantial effect on interstate commerce.

212.   Plaintiffs and all those in the Class have been or will be injured in their property as a result of Valve's conduct.

213.   Plaintiffs and all those in the Class have suffered and will suffer injury of the type that the antitrust laws were intended to prevent. Plaintiffs have been and will be injured by the harm to competition as a result of Valve's conduct.

### FOURTH CAUSE OF ACTION

### SHERMAN ACT SECTION 2—ATTEMPTED MONOPOLIZATION OF THE PC IN-GAME PAYMENT PROCESSING MARKET (15 U.S.C. § 2)

214.   The foregoing paragraphs are incorporated by reference as though fully set forth herein.

215.   In the relevant market for PC In-Game Payment Processing, Valve has engaged in exclusionary and anticompetitive conduct, including but not limited to market-wide price controls, tying, coercion of disloyal publishers, and blocking competitive strategies, as alleged herein.

216.   Valve's conduct has had an anticompetitive effect in the relevant market for PC In-Game Payment Processing.

217.   Valve's conduct has no legitimate business purpose or procompetitive effect.



218.   Valve has engaged in that conduct with the specific intent of monopolizing the relevant market for PC In-Game Payment Processing.

219.   Valve has engaged in that conduct with a dangerous probability of monopolizing the relevant market for PC In-Game Payment Processing.

220.   In the absence of the Valve PMFN and Valve's tying conduct, rivals in the PC In-Game Payment Processing Market would charge lower prices and force Valve to compete. Such competition would in turn lower prices on Valve's own PC In-Game Payment Processing, benefitting consumers that utilized this service.

221.   Valve's conduct has had a substantial effect on interstate commerce.

222.   Plaintiffs and all those in the Class have been or will be injured in their property as a result of Valve's conduct.

223.   Plaintiffs and all those in the Class have suffered and will suffer injury of the type that the antitrust laws were intended to prevent. Plaintiffs have been and will be injured by the harm to competition as a result of Valve's conduct.

### FIFTH CAUSE OF ACTION

### SHERMAN ACT SECTION 1—UNREASONABLE RESTRAINTS ON TRADE THROUGH PUBLISHERS (15 U.S.C. § 1)

224.   The foregoing paragraphs are incorporated by reference as though fully set forth herein.

225.   As alleged above, Valve and the various publishers have enter into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain market power in the relevant market for PC Game Distribution and PC In-Game Payment Processing.

226.   Through a combination in restraint of trade, Valve and the various publishers agree that, as a condition of distributing games and in-game content through the Steam Store, the publishers will not offer lower prices or enhanced content for any games or in-game products offered through other distribution channels.  Valve and the various publishers further combine in



1   restraint of trade to coordinate pricing through Valve's pricing guidance, pricing

2   "recommendations," and "post and adhere" pricing system.

3       227.    Valve's conduct has had an anticompetitive effect in the relevant markets for PC

4   Game Distribution and PC In-Game Payment Processing.

5       228.    Valve's conduct, in combination with publishers, has no legitimate business

6   purpose or procompetitive effect.

7       229.    There are less restrictive alternatives to the PMFN and other restraints has Valve

8   imposed through agreements with game publishers.

9       230.    Valve's conduct has had a substantial effect on interstate commerce.

10      231.    Plaintiffs and all those in the Class have been or will be injured in their property

11  as a result of Valve's conduct.

12      232.    Plaintiffs and all those in the Class have suffered and will suffer injury of the type

13  that the antitrust laws were intended to prevent. Plaintiffs have been and will be injured by the

14  harm to competition as a result of Valve's conduct.

### SIXTH CAUSE OF ACTION

### SHERMAN ACT SECTION 1—UNREASONABLE RESTRAINTS ON TRADE BY TYING CONDUCT (15 U.S.C. § 1)

19      233.    The foregoing paragraphs are incorporated by reference as though fully set forth

20  herein.

21      234.    As alleged above, through its agreements and guidelines with game publishers,

22  Valve has unlawfully tied PC In-Game Payment Processing to PC Game Distribution.

23      235.    Through its tying conduct, Valve requires that consumers use a Steam Wallet to

24  make in-game purchases within games distributed through the Steam Store, foreclosing

25  consumers from using, and publishers from providing, alternative options for PC In-Game

26  Payment Processing.

27      236.    PC In-Game Payment Processing and PC Game Distribution are separate products

28  for which there is separate demand.  On other gaming platforms, and in other markets unaffected

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

by Valve's tie, consumers can (and do) purchase PC Game Distribution service without also obtaining PC In-Game Payment Processing from the same provider. Likewise, consumers can purchase PC In-Game Payment Processing without obtaining PC Game Distribution from the same provider.

237.    In a competitive market without Valve's tie, publishers would be able to provision, and consumers would be able to select among, a range of PC In-Game Payment Processing services to process in-game transactions within games acquired from Steam. This would inject competition into the PC In-Game Payment Processing and prevent Valve from imposing supracompetitive 30% commission on in-game purchases.

238.    In the absence of the Valve PMFN and Valve's tying conduct, rivals in the PC In-Game Payment Processing Market would charge lower prices and force Valve to compete. Such competition would in turn lower prices on Valve's own PC In-Game Payment Processing, benefitting consumers that utilized this service.

239.    Valve has substantial market power—indeed, a monopoly—in the tying product market for PC Game Distribution.

240.    Valve's tie affects a substantial volume of commerce, likely billions annually.

241.    Valve's tying conduct has no legitimate business purpose or procompetitive effect.

242.    There are less restrictive alternatives to the restraints Valve imposed.

243.    Valve's conduct has had a substantial effect on interstate commerce.

244.    Plaintiffs and all those in the Class have been or will be injured in their property as a result of Valve's conduct.

245.    Plaintiffs and all those in the Class have suffered and will suffer injury of the type that the antitrust laws were intended to prevent. Plaintiffs have been and will be injured by the harm to competition as a result of Valve's conduct.



**SEVENTH CAUSE OF ACTION**

**Washington State Consumer Protection Act, RCW 19.86**
**(Nationwide Class)**

246.     The foregoing paragraphs are incorporated by reference as though fully set forth herein.

247.     The claims alleged above constitute unfair methods of competition under Washington State law provisions RCW 19.86.020, 19.86.040, and 19.86.030.

248.     Valve is engaged in unfair and deceptive practices in commerce, which affect the public interest and cause injury to business and property.

249.     Valve's contracts, combinations, or conspiracies with game publishers are anticompetitive restraints that have the purpose and effect of fixing and inflating prices in the relevant market.

250.     The contracts, combinations, or conspiracies at issue are in restraint of trade.

251.     Valve's monopolization and attempted monopolization have the purpose and effect of fixing and inflating prices in the relevant market.

252.     As such, class members are entitled to damages and an injunction under Revised Code of Washington 19.86.090.

**EIGHTH CAUSE OF ACTION**

**California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code Section 17200 et seq.**
**(California Subclass)**

253.     The foregoing paragraphs are incorporated by reference as though fully set forth herein.

254.     The UCL defines unfair competition to include any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with § 17500) of Part 3 of Division 7 of the Business and Professions Code." *See* Cal. Bus. & Prof. Code § 17200.



255.    Valve violated the UCL by engaging in unlawful, unfair, and deceptive business acts and practices, as alleged herein.  Plaintiffs were injured as a result of Valve's UCL violations, including through overcharges incurred in the purchase of PC games and in-game products.

256.    Valve is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

257.     California law and the UCL apply to the claims of the California Subclass because California has an overriding interest in ensuring that its residents are permitted to assert claims for public injunctive relief under the UCL and otherwise.

258.    Plaintiffs seek public injunctive relief under the UCL, including a permanent injunction preventing Valve from using the PFMN, tying arrangements, and other anticompetitive practices to maintain monopolies in the PC Game Distribution Market and the PC In-Game Payment Processing Market.  Such injunctive relief would inject competition into these markets to the benefit of the public at large, including future purchasers of PC games and in-game content.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request the following relief:

A.    Injunctive relief benefiting the class and the public, including a permanent injunction barring Valve's unlawful restraints;

B.    Damages in an amount to be determined;

C.    Restitution;

D.    Treble damages;

E.    Attorneys' fees;

F.    Costs;

G.    Pre-judgment and post-judgment interest at the maximum rate permitted under the law;

H.    Punitive damages; and

1    I.    Declaratory relief, including but not limited to a declaration and judgment that

2  Valve's conduct alleged in the Complaint violates the laws alleged in the Complaint; and such

3  other and further relief as the Court deems proper and just.

4                                    **JURY DEMAND**

5          Plaintiffs, on behalf of themselves and the proposed Class, demand a trial by jury on all

6  issues so triable.

DATED:  August 9, 2024                    Respectfully submitted,

                                          HAGENS BERMAN SOBOL SHAPIRO LLP

                                          /s/ *Steve W. Berman*
                                          Steve W. Berman (WSBA No. 12536)

                                          /s/ *Xiaoyi Fan*
                                          Xiaoyi Fan (WSBA No. 56703)
                                          1301 Second Avenue, Suite 2000
                                          Seattle, WA 98101
                                          Telephone: (206) 623-7292
                                          Facsimile: (206) 623-0594
                                          E-mail:   steve@hbsslaw.com
                                          E-mail:   kellyf@hbsslaw.com


                                          Ben M. Harrington (*pro hac vice* forthcoming)
                                          HAGENS BERMAN SOBOL SHAPIRO LLP
                                          715 Hearst Avenue, Suite 300
                                          Berkeley, CA  94710
                                          Telephone: (510) 725-3034
                                          Facsimile: (510) 725-3001 fax
                                          E-mail:   benh@hbsslaw.com


                                          William Ward Bucher IV  (*pro hac vice*
                                          forthcoming)
                                          BUCHER LAW PLLC
                                          350 Northern Blvd, Ste. 324 -1519
                                          Albany, NY 12204-1000
                                          Telephone: (202) 997-3029
                                          Email: will@bucherlawfirm.com

                                          *Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT - 56
Case No. 2:24-cv-01218
011258-11/2686081 V1

